# OREGON AND CALIFORNIA RAILROAD COMPANY *v.* UNITED STATES. No. 1.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH. CIRCUIT.

No. 186.  Argued March 4, 1903.—Decided April 6, 1903.

In a suit brought under the act of Congress of March 3, 1887, c. 376, to compel the reconveyance of lands covered by patent issued February 20, 1893 on the ground that it included land to which there were adverse claims of settlers to the land on which they respectively resided and which the United States now claimed for them, *Held:*

(1) That under the land grant acts the railroad company did not acquire and could not have acquired an interest in specific sections of land within the indemnity limits specified in the grant before their actual and approved selection under the direction of the Secretary of the Interior, prior to the date of occupancy by the respective settlers.

(2) No right of the railroad company attaches or can attach to specific lands within indemnity limits until there is a selection under the direction or with the approval of the Secretary of the Interior.

(3) The rights which *bona fide* occupancy gave to the settler under the act of 1866 are not defeated by a mere selection afterwards of the land by the railroad company—the settler having, after the lands were surveyed, promptly taken the necessary steps to protect his rights under the homestead law.  In such case, the entry made under these laws relates back to the date of the settlement of the lands.

(4) It cannot be claimed that *all* the lands within the indemnity limits were required to supply deficits, when there had been no adjustment and determination of the amount of lieu lands required prior to his *bona fide* occupancy of the land.

THE case is stated in the opinion of the court.

*Mr. Maxwell Evarts* for appellant.

*Mr. Assistant Attorney Russell* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

By the act of Congress of March 3, 1887, c. 376, it was pro-

vided that if, at the completion of the adjustments of land grants thereby directed to be made, or sooner, it appeared that lands had been from any cause erroneously certified or patented to or for any company claiming by, through or under grant from the United States to aid in the construction of a railroad, it should be the duty of the Secretary of the Interior to thereupon demand from such company a relinquishment or reconveyance to the United States of all such lands, whether within granted or indemnity limits; and if the company did not reconvey within ninety days after demand made, it should thereupon be the duty of the Attorney General to commence and prosecute in the proper courts the necessary proceedings to cancel the patents, certification or other evidence of title theretofore issued for the lands, and to restore the title thereof to the United States. 24 Stat. 556, c. 376.

In *United States* v. *Missouri &c. Railway*, 141 U. S. 360, 380, 382—which was an action brought by the United States after the passage of the above statute to have certain patents for land cancelled—this court, after observing that as to some of the lands the United States appeared to have a direct interest in them, said: " As to others, it is under an obligation to claimants under the homestead and preëmption laws to undo the wrong alleged to have been done by its officers, in violation of law, by removing the cloud cast upon its title, by the patents in question, and thereby enable it to properly administer these lands, and to give clear title to those whose rights, under those laws, may be superior to those of the railway company. A suit, therefore, to obtain a decree annulling the patents in question, so far as it is proper to do so, was required by the duty the Government owed as well to the public as to the individuals who acquired rights, which the patents, if allowed to stand, may defeat or embarrass." Reference was made in that case to *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273, 286, in which it was held that the United States could sue to set aside a patent improperly issued, where it appeared that there was an obligation on the part of the United States to the public, or to any individual, or where it had any interest of its own; also, to *United States* v. *Beebe*, 127 U. S. 338, 342, in which it was

held that patents procured by fraud could be cancelled at the suit of the United States where that was necessary to be done in order that it might fulfill its obligations to others. The court then observed: " These principles equally apply where patents have been issued by mistake, and they are specially applicable where, as in the present case, a multiplicity of suits, each one depending upon the same facts and upon the same questions of law, can be avoided, and where a comprehensive decree, covering all contested rights, would accomplish the substantial ends of justice." See also *United States* v. *Oregon &c. Railroad Co.*, 176 U. S. 28.

In this state of the law, the present suit was brought by the United States against the Oregon and California Railroad Company in order to obtain a decree cancelling certain patents for lands, which, it was alleged, had been illegally and by mistake issued in the name of the United States to that company, which succeeded to the rights of the Oregon Central Railroad Company.

The case was heard upon a stipulation as to evidence, from which the following facts appear:

By the act of Congress of July 25, 1866, c. 242, 14 Stat. 239, the California and Oregon Railroad Company, and such company organized under the laws of Oregon as the Legislature of the latter State designated, were authorized to locate, construct and maintain a railroad and telegraph line between Portland, Oregon, and the Central Pacific Railroad Company in California.

For the purpose of aiding in the construction of that line, Congress granted to those companies, their successors and assigns, every alternate odd-numbered section of public lands, not mineral, to the amount of twenty sections per mile, (ten on each side,) of the railroad line. But the act provided that when any of the alternate sections or parts of sections should be found " to have been granted, sold, reserved, *occupied by homestead settlers*, preëmpted, or otherwise disposed of, other lands, designated as aforesaid, shall be selected by said companies in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections designated by odd numbers as aforesaid, near-

est to and not more than ten miles beyond the limits of said *first-named* alternate sections ; and as soon as the said companies, or either of them, shall file in the office of the Secretary of the Interior a map of the survey of said railroad, or any portion thereof; not less than sixty continuous miles from either terminus, the Secretary of the Interior shall withdraw from sale public lands herein *granted* on each side of said railroad, so far as located and within the limits before specified.  .  .  .  Settlers under the provisions of the homestead act, who comply with the terms and requirements of said act, shall be entitled, within the limits of said grant, to patents for an amount not exceeding eighty acres of the land so reserved by the United States, anything in this act to the contrary notwithstanding."

The Oregon Central Railroad Company was designated by the Oregon Legislature as the company organized under the laws of Oregon, entitled to receive the granted lands in Oregon, and the benefits and privileges of the above act of 1866.

Prior to October, 1869, that company definitely fixed on the ground and surveyed the first section of the railroad in Oregon. That section extended from Portland to Jefferson, and comprised not less than sixty continuous miles from the northern terminus of the road ; and on October 25, 1869, the company filed in the office of the Secretary of the Interior, and on January 29, 1870, the Secretary duly accepted and approved, a map of the survey and definite location of that section.

During the year 1869 and the months of January and February, 1870, the company definitely fixed on the ground and surveyed the second section of its road, which section comprised not less than 124 continuous miles from Jefferson ; and on March 26, 1870, filed in the office of the Secretary, and on March 29, 1870, that officer accepted and approved, a map of the survey and definite location of that section.

On the 7th of April, 1870, the Commissioner of the General Land Office, under the direction of the Secretary of the Interior, withdrew all the odd-numbered sections of land lying within thirty miles on each side of the railroad (as shown on the map of survey and definite location filed with the Secretary on March 26, 1870,) from sale or location, preëmption or home-

stead entry; and that withdrawal remained continuously thereafter in force, except so far as, if at all, it was affected by an order of the Secretary made August 15, 1887, revoking the order of April 7, 1870, as to the odd-numbered sections lying within the *indemnity* limits of the grant made in 1866, and declaring the odd-numbered sections, lying within such *indemnity* limits, to be restored to the public domain, subject to preemption and homestead entry, as well as to the provisions of the above grant. The lands so withdrawn April 7, 1870, were within the jurisdiction of the district local land office at Roseburg, and notice of such withdrawal was received at that office on April 25, 1870.

During the years 1868 and 1869, and prior to December the 25th, 1869, the Oregon Central Railroad Company constructed and fully equipped the first twenty miles of the railroad contemplated by the act of 1866, commencing at Portland and extending along the line shown upon the map filed in the office of the Secretary of the Interior on October the 29th, 1869. And in the years 1869 and 1870, and prior to September the 1st, 1870, the above two companies fully equipped the second twenty miles of the railroad, commencing at the end of the first constructed twenty miles and extending along the line shown on the map to a point distant forty miles from the commencement of the railroad at Portland—a portion of the second twenty miles having been constructed by the Oregon Central Railroad Company, the remainder by the defendant.

The whole line of railroad contemplated by the act of 1866, commencing at the end of the second constructed twenty miles, was constructed by the defendant company during the years 1870, 1871 and 1872; and prior to December the 4th, 1872, the entire line from Portland to Roseburg was continuously operated for all the purposes contemplated by Congress.

Commissioners were appointed by the President to examine the railroad as constructed from Portland to Roseburg. That duty was performed, and they reported to the President, under oath, that the railroad between those points had been completed and equipped in all respects as required, and was ready for the service contemplated by the act of 1866. Those reports were

·duly accepted and approved· by the President. The report as to the seventh, eighth and ninth sections, including the last seventy-eight miles of the road from Portland to Roseburg, was made on July 10, 1878, and the next day was accepted and approved.

The remaining part of the road in Oregon, extending from · Roseburg to the southern boundary of that State, was constructed, fully equipped and made ready by the defendant company during the years 1878 to 1889, inclusive, and all prior to the year 1900. It was duly examined by commissioners who reported thereon, and their reports were accepted and approved.

All the lands described in the bill of complaint are distant more than twenty miles from but lie within thirty miles on one side of the road extending from Jefferson to Roseburg, shown on the map filed March 26, 1870 ; and they were all included and embraced by the withdrawal made by the Secretary on the 7th of April, 1870.

· No·part or portion of the lands described in the bill of complaint are mineral lands, nor are they included by any exception or reservation from the indemnity land grant in Oregon, made by the act of 1866, except so far as, if at all, they were excepted. or reserved therefrom by reason of the settlements and facts hereinafter to be referred to.

On August 16, 1892, all the lands described in the bill were free and clear for selection by the defendant company as part and parcel of the *indemnity* lands granted by the act of Congress, except so far as, if at all, they were excepted or reserved by those settlements and facts.

: On the 16th of August, 1892, and the 19th of October, 1892, the defendant company filed with the register and receiver of the United States Land Office at Roseburg its several lists selecting the lands in question as indemnity lands in lieu of lands · of equal area, parts of odd-numbered sections within the primary limits of the grant made in 1866 and otherwise disposed of by the United States prior to the passage of that act. Those lists were accompanied by the fees, costs and charges required by law, and in all respects conformed to the directions, rules, regulations and requirements of the Secretary of the Interior and of the Com-

missioner of the General Land Office. They were severally approved and certified by the register and receiver, and the defendant company had not then, nor has it subsequently, selected or received lands in lieu of those therein described as the basis of selections by it made, other than the lands so selected by said lists.

In the following years the following persons, each being a duly qualified entryman under the homestead laws of the United States, settled upon the lands respectively claimed for them in this suit, to wit: 1869, Louis [Charles] Heller; 1878, J. R. Peters; 1878, John Sapp; 1882, George C. Peck; 1883, Uriah W. Wren; 1885, Baxter W. Jenkins; 1885, Charles E. Barton; 1888, Joseph A. Cox; 1889, Charles W. Seeley; 1889, John W. Carey; 1890, F. W. Huddleston; 1890, Alfred R. Young; 1890, Abraham M. Peck. Each person made his settlement with the intention of making a homestead entry of the lands, whenever that could be done under the acts of Congress. After the date of settlement each settler continuously resided and made improvements upon his land in the way of a dwelling house, barn, outhouses, fencing, clearing and planting of trees. And on October 27, 1892, within ninety days after the official plat of the survey of the lands was filed in the United States Land Office at Roseburg, each settler, in good faith, filed a formal application in the land office for a homestead entry of and for the lands upon which he settled and improved and upon which he continuously resided after the date of his first occupancy.

On the 20th of February, 1893, the Commissioner of the Land Office and the Secretary of the Interior having approved the selections made by the railroad company, a patent was issued conveying to it all the lands in dispute. But when the company's lists were approved neither the Commissioner nor the Secretary had any knowledge of the adverse claims of the above settlers to the lands upon which they respectively resided, and which the United States now claims for them.

On the 27th day of October, 1893, the land grant made by the act of 1866 being still unadjusted, the Commissioner of the Land Office demanded of the railroad company a reconveyance of the lands covered by the patent of 1893 upon the ground

that the patent to it had been erroneously issued. The company refused to reconvey, and claims to be the owner of such lands. Hence the present suit to have that patent cancelled.

The Circuit Court, upon final hearing, found the equities of the case to be with the United States, and a decree was entered cancelling the patent issued to the Oregon and California Railroad Company. That decree was affirmed by the Circuit Court of Appeals, 109 Fed. Rep. 514.

1. Some of the questions referred to in argument as bearing upon the issues presented by the record have been determined by decisions of this court rendered since this litigation commenced.

In *Hewitt* v. *Schultz*, 180 U. S. 139, which related to the grant of lands made to the Northern Pacific Railroad Company, by the act of July 2, 1864, c. 217, 13 Stat. 365, this court accepted the construction of that act as adopted and adhered to by the Land Department, and held that the Secretary of the Interior had no power, simply upon the *definite location* of the Northern Pacific Railroad, to withdraw from the operation of the preëmption and homestead laws lands within the *indemnity* limits of the road as defined by Congress. *Northern Pacific Railroad Co.* v. *Miller*, 7 L. D. 100, 125 ; *Northern Pacific Railroad Co.* v. *Davis*, 19 L. D. 87, 90. In the present case, the line of the railroad, opposite to which are the lands here in dispute, was definitely located in 1870, while (with the exception of one tract, about which the railroad company makes no question) the lands in dispute were not settled upon until after that year. We have seen that upon acceptance of the map of definite location the Secretary of the Interior, according to the stipulated facts, made an order (which was duly received at the local land office) withdrawing all the odd-numbered sections within thirty miles on each side of the road shown on the map of survey and definite location, from sale or location, preëmption or homestead entry. That withdrawal included the odd-numbered sections in the indemnity limits, within which the lands in dispute were situated. We hold on the authority of *Hewitt* v. *Schultz* that it was beyond the power of the Secretary to make such an order in respect of lands within the indemnity

limits of the grant made by the act of 1866. The reasoning in that case, touching this proposition, applies to the case now before us. In 1887 the Secretary, as if to remove the apparent obstacle placed in the way of preëmption and homestead settlers created by the order of 1870, made an order revoking the previous one of withdrawal so far as it related to indemnity limits, and declaring the odd-numbered sections lying within the entire indemnity limits of the grant restored to the public domain and subject to preëmption and homestead entry, as well as to the provisions of the act of 1866. We need not discuss here the question of the power of the Secretary of the Interior to revoke an order of withdrawal once legally made, notice whereof had been given at the local land office. It is sufficient to say that the railroad company did not by the order of 1870, relating to lands within the indemnity limits, acquire an interest in any particular odd-numbered sections within those limits; nor did that order prevent the *bona fide* occupancy by settlers of odd-numbered sections *within such limits* up to the time of the approval of selections made by the railroad company of lieu lands to supply any deficit in the place limits.

In *Nelson* v. *Northern Pacific Railway*, 188 U. S. 108, decided at the present term of the court, it was held that the act of 1864 making a land grant to the Northern Pacific Railroad Company, and the act of May 14, 1880, c. 89, for the relief of settlers on the public lands, recognized the right at any time prior to definite location to settle upon the unsurveyed public lands embraced by the grant of 1864, notwithstanding there was, at the time, in existence an order of withdrawal, based only upon a map of general route not issued pursuant to any express direction of Congress; provided such settlement was accompanied by residence on the land, in good faith, with the intention on the part of the settler to avail himself of the benefits of the homestead law as soon as the lands were surveyed. This decision rested mainly on the ground that Congress intended by the act of 1864 to protect the right of *bona fide* settlers acquired before the railroad company had, by an accepted map of definite location, obtained a vested interest in particular odd-numbered sections granted.

These principles are applicable to the present case if, as contended by the United States, the railroad company did not acquire, and could not have acquired, an interest in specific sections of lands within the *indemnity* limits before their actual and approved selection, under the direction of the Secretary prior to the date of occupancy by the respective settlers.

2. We have seen, from the stipulated facts, that it was not until 1892 that the railroad company made its selection of lands within the indemnity limits to supply deficiencies in its place or granted limits. But this occurred after each one of the entrymen, whose rights the Government is now seeking to protect, had made his settlement with the intention to follow it up by a *bona fide* entry under the homestead laws. In other words, the lands were "occupied by homestead settlers" (to use the words of the granting act of 1866) at the time they were selected by the railroad company. Now, it has long been settled that while a railroad company, after its definite location, acquires an interest in the odd-numbered sections within its place or granted limits—which interest relates back to the date of the granting act—the rule is otherwise as to lands within indemnity limits. As to lands of the latter class, the company acquires no interest in any specific sections until a selection is made with the approval of the Land Department; and then its right relates to the date of the selection. And nothing stands in the way of a disposition of indemnity lands, prior to selection, as Congress may choose to make. In *Ryan* v. *Railroad Company*, 99 U. S. 382, which was a contest as to lands within the indemnity limits, this court said : "It was within the secondary or indemnity territory where that deficiency was to be supplied. The railroad company had not and could not have any claim to it until specially selected, as it was, for that purpose." And the reason given was that "when the road was located and the maps were made, the right of the company to the odd sections first named became *ipso facto* fixed and absolute. With respect to the 'lieu lands,' as they are called, the right was only a float, and attached to no specific tracts until the selection was actually made in the manner prescribed." In *St. Paul Railroad* v. *Winona Railroad*, 112

U. S. 720, 731, the court, referring to this principle, said: " The reason of this.is that, as no vested right can attach to the lands in place—the odd-numbered sections within six miles of each side of the road—until these sections are ascertained and identified by a legal location of the road, so in regard to the lands to be selected within a still larger limit, their identification cannot be known until the selection is made. .It may be a long time after the line of the road is located before it is ascertained how many sections, or parts of sections, within the primary limits have been lost by sale or preëmption. It may be still longer before a selection is made to supply this loss." After observing that twenty years expired in that case after the location of the road before any selection of lieu lands was made, the court added: " Was there a vested right in this company, during all this time, to have not only these lands, but all the other odd sections within the twenty-mile limits on each side of the line of the road, await its pleasure ? Had the settlers in that populous region no right to buy of the Government because the company might choose to take them, or might, after all this delay, find out that they were necessary to make up deficiencies in other quarters ? How long were such lands to be withheld from market, and withdrawn from taxation, and forbidden to cultivation ? " To the same effect are the following cases: *Grinnell* v. *Railroad Co.*, 103 U. S. 739 ; *Cedar Rapids Railroad* v. *Herring,* 110 U. S. 27 ; *Kansas Pacific* v. *Atchison Railroad*, 112 U. S. 414, 421 ; *Sioux City &c. Railroad* v. *Chicago &c. Railroad*, 117 U. S. 406, 408 ; *Barney* v. *Winona &c. Railroad*, 117 U. S. 228, 232 ; *Wisconsin Railroad* v. *Price County*, 133 U. S. 496, 508, 513 ; *Nelson* v. *Northern Pacific Railway*, above cited. Having regard to the adjudged cases, it is to be taken as established that, unless otherwise expressly declared by Congress, no right of the railroad company attaches or can attach to specific lands within indemnity limits until there is a selection under the direction or with the approval of the Secretary.

3. But it is contended that as the selection by the company (except as to the tract which was occupied in 1869, before any

selection by the company of lieu lands) was prior to the application by the respective settlers for entry under the homestead laws, its right to the lands in question was superior to that asserted by the settlers. This view is completely met by the fact that the settler, by prior occupancy in good faith, could avail himself of the homestead acts whenever, by an official survey, the way is opened by the Government for him to do so, and by the fact that, within ninety days after these lands were surveyed, he filed in the proper office his application to enter them under the homestead laws of the United States. He moved with due diligence to protect and perfect the right acquired by his occupancy of the land with the intention to avail himself of the benefit of those laws. That right was not to be affected or impaired by the fact that the lands were not surveyed at the date of occupancy. *Nelson* v. *Northern Pacific Railway,* above cited; *Ard* v. *Brandon,* 156 U. S. 537, 543; *Tarpey* v. *Madsen,* 178 U. S. 215, 219. In the *Ard* case the court said: "The law deals tenderly with one who, in good faith, goes upon the public lands, with a view of making a home thereon. If he does all that the statute prescribes as the condition of acquiring rights, the law protects him in those rights, and does not make their continued existence depend alone upon the question whether or no he takes an appeal from an adverse decision of the officers charged with the duty of acting upon his application." In the *Tarpey* case it was said that "the right of one who has actually occupied [public lands], with an intent to make a homestead or preëmption entry, cannot be defeated by the mere lack of a place in which to make a record of his intent;" that if a settler was in possession before definite location, "with a view of entering it as a homestead or preëmption claim, and was simply deprived of his ability to make his entry or declaratory statement by the lack of a local land office, he could undoubtedly, when such office was established, have made his entry or declaratory statement in such way as to protect his rights." So, if the condition of the lands, being unsurveyed, prevents the making by a *bona fide* occupant of a proper application of record to enter them under the homestead laws his rights will not be lost, if, after the lands are surveyed

he applied in due time to enter the lands under those laws. And such has been held to be the object and effect of the act of May 14, 1880, c. 89, 21 Stat. 140. We could not otherwise adjudge in this case without holding that the mere selection of the lands by the railroad company displaced or destroyed the rights of a *bona fide* settler arising from previous occupancy with the intention of making the required homestead entry whenever he was permitted to do so. We cannot so hold. We adjudge that the rights which *bona fide* occupancy gave to the settler under the act of 1866 are not defeated by a mere selection afterwards of the lands by the railroad company—the settler having, after the lands were surveyed, promptly taken the necessary steps to protect his rights under the homestead laws. And in such case, the entry made under those laws, relates back to the date of settlement on the lands. It was so substantially held in *Nelson* v. *Northern Pacific Railway*, above cited.

4. It is also said that all the lands within the indemnity limits were required to supply the deficit in place limits arising from the disposition prior to definite location by sale and otherwise of lands within the granted limits. But the extent to which lieu lands could be required to supply such deficit in place lands could not be properly or legally determined until there was an adjustment of the grant of lands in respect of place limits. In any event, no such adjustment having taken place prior to the date of the settler's *bona fide* occupancy, his rights, based upon such occupancy, would not be affected by the fact, subsequently appearing, in whatever way, that all the odd-numbered sections within the indemnity limits were needed to supply deficiencies in place limits. At the time the settler went upon the land, in good faith, to make it his home and to perfect his title under the homestead laws, there was nothing of record that stood in the way of his right to occupy the lands and to remain thereon until he could perfect his title by formal entry under the homestead laws.

Other points were made in the argument of the case, but they need not be specially noticed, as what we have said re-

quires, independently of those points, an affirmance of the decree of the Circuit Court and the Circuit Court of Appeals.

The decree is

*Affirmed.*

MR. JUSTICE BREWER took no part in the disposition of this case.