TRODICK v. NORTHERN PAC. RY. CO. et al.

(Circuit Court of Appeals, Ninth Circuit.   November 5, 1908.)

No. 1,563.

1. PUBLIC LANDS (§ 79*) — RAILROAD GRANT — LANDS EXCEPTED — "CLAIM OF RIGHT."

Unsurveyed land within the primary limits of the grant to the Northern Pacific Railroad Company by Act July 2, 1864 (13 Stat. 365, c. 217), as fixed by the definite location of the road, but which at the time of the filing of the map of such location was actually occupied by a settler, who had made improvements thereon with the bona fide intention of acquiring title thereto under the homestead law when it should be surveyed, was subject to a "claim or right" within the meaning of the act, and did not pass under the grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 244, 245; Dec. Dig. § 79.*

For other definitions, see Words and Phrases, vol. 2, pp. 1213–1214.]

2. PUBLIC LANDS (§ 35*)—HOMESTEAD SETTLERS ON UNSURVEYED LAND—RIGHT TO ACQUIRE TITLE.

Under Act May 14, 1880, c. 89, § 3, 21 Stat. 140 (U. S. Comp. St. 1901, p. 1393), which extends to homestead settlers on unsurveyed public lands the same right as pre-emption settlers to perfect their right by application made within three months after the filing of the plat of survey, the failure to file within such time does not affect the settler's right, except as against another claimant who has acquired or initiated some right before the application is in fact made.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 73; Dec. Dig. § 35.*]

3. PUBLIC LANDS (§ 35*) — RIGHT OF HOMESTEAD SETTLER — PURCHASE OF IMPROVEMENTS.

The fact that a settler, who is actually residing on public land with the bona fide intention of acquiring title thereto under the homestead law, purchased his improvements from a prior settler, does not affect his right to so acquire the land.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 35.*

Rights acquired by homestead settlements and entries, see note to McCune v. Essig, 59 C. C. A. 434.]

Morrow, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Montana.

Walsh & Nolan, for appellant.

Massena Bullard, William Wallace, Jr., and Charles Donnelly, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.   This suit was brought by the appellant in the court below to obtain a decree requiring the conveyance to him of the title to the S. E. ¼ of section 35, township 15 N., range 4 W., Helena land district, of the state of Montana, conveyed by the government patent issued January 10, 1903, to the appellee, the Northern Pacific Railway Company, as the successor in interest of the Northern Pacific Railroad Company, the beneficiary of the grant made to it by

Act Cong. July 2, 1864, c. 217, 13 Stat. 365. The case shows that the tract in controversy is within the primary limits of that grant to the Northern Pacific Railroad Company, the map of the definite location of the line of which road was filed July 6, 1882. At that time the land in controversy was unsurveyed. It was not surveyed until the year 1891; the plats of the survey thereof being filed in the local land office on the 10th day of August of that year. September 21, 1892, it was listed to the railroad company. The record further shows that one Martin Lamlein established his residence on this tract of unsurveyed government land with his family in 1877, with the bona fide intention of acquiring title thereto under the homestead laws, made improvements thereon of the value of about $1,000, and continued to reside upon the land until his death, during the year 1891. In holding that such settlement did not except the land from the operation of the grant to the railroad company, the Commissioner of the General Land Office expressly found the facts to be as above stated, and further, in communicating his decision to the local land office, said:

"It is undoubtedly true that the land was occupied by Mr Lamlein when the right of the company attached, and that he was qualified to make entry of the same and settled there with the intention of doing so, as the circumstances indicate. Had he lived until the plat of survey was filed in your office, he or his wife would, without doubt, have been allowed to perfect the claim by them initiated prior to July 6, 1882. Since Mr. Lamlein had no claim of record, and the claim of Trodick had its inception subsequent to the definite location of the road, it must be held that the land inured to the grant. N. P. R. R. Co. v. Colburn, 164 U. S. 387, 17 Sup. Ct. 98, 41 L. Ed. 479."

The case further shows that just before his death Lamlein sold the improvements to the appellant, Trodick, who thereupon took possession of the land with the intention of acquiring the title thereto from the government, but that Trodick did not apply to enter it as a homestead until January 10, 1896, which application on his part, being refused by the local land office, resulted in an appeal to the Commissioner of the General Land Office, and in his adverse decision already referred to. The court below, in dismissing the bill, as it did, referred to Act Cong. May 14, 1880, c. 89, 21 Stat. 140 (U. S. Comp. St. 1901, p. 1392), by which the settler upon public unsurveyed lands, with the intention to claim under the homestead law, was allowed the same time to file his homestead application and to perfect his original entry in the United States land office, as was allowed a pre-emption settler to put his claim on record, and by which it was provided that such homesteader's right should relate back to the date of his settlement, the same as if he settled under the pre-emption laws. Said the court below:

"This would have given Lamlein, had he lived, 90 days after the filing of the township plat (August 10, 1891), within which time he was obliged to put his application for entry on file, so as to become of record. He had sold, however, to Trodick in 1889, so that the very best possible position that may be conceded to Trodick is such as Lamlein could have occupied, if he had not sold, and had lived until after the plats of survey were filed. But, even upon such a concession, it became his duty, as it would have been Lamlein's duty, to file his application for homestead within 90 days after the filing of the township plat in 1891. He failed to do so, though, and by his omission he lost his rights to enter the land under the homestead laws. The case is there-

fore one where, the occupant having failed to take the necessary steps to file his application until long after the survey and filing, the land passed to the railroad grant, and no claim of ownership can be made at this time. As I read the cases of Nelson v. Northern Pacific Ry. Co., 188 U. S. 109, 23 Sup. Ct. 302, 47 L. Ed. 406 and Oregon & California R. R. Company v. United States, 189 U. S. 103, 23 Sup. Ct. 615, 47 L. Ed. 726, and the cases therein cited, they sustain these views."

We are unable to agree with the trial court in this respect. The land in question being within the primary limits of the railroad grant, whether or not the title thereto passed to that company depended upon the status of the land at the time of the filing of the map of the definite location of the road, which was July 6, 1882. This is the well-established law upon the subject, as is shown by the cases referred to in Nelson v. Northern Pacific Ry. Co., 188 U. S., from and including page 116 to and including page 132, 23 Sup. Ct. 302, 47 L. Ed. 406. The case of Nelson v. Northern Pacific Ry. Co. is, in our opinion, precisely similar to the case we have here. The land grant act is the same in both cases. In both the land in controversy fell within the primary limits of that grant, was unsurveyed at the time of the filing of the map of definite location of the road, and there Nelson, as Lamlein here, was on that day in possession of the land, with his improvements, having years before entered into its possession with a bona fide intention of acquiring title thereto under the homestead laws. In the Nelson Case the Supreme Court distinctly adjudged that the Northern Pacific Railroad Company acquired no vested interest to any land under its grant of July 2, 1864, prior to the filing of the map of the definite location of its road, and that all lands which were then "occupied by homestead settlers" with the bona fide intention to acquire the same under the homestead laws were expressly excluded therefrom. 188 U. S. 116, 23 Sup. Ct. 304, 47 L. Ed. 406, and cases there cited. On page 133 of 188 U. S., page 311 of 23 Sup. Ct. (47 L. Ed. 406), in its opinion, the court said:

"Nelson's occupancy occurred after the passage of the act of 1880 [that is to say, Act May 14, 1880, c. 89, 21 Stat. 140 (U. S. Comp. St. 1901, p. 1392), already referred to]. While that act did not apply to a railroad company which had acquired the legal title by the definite location of its road, it distinctly recognized the right prior to such time to settle upon the public lands, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws. In occupying the land here in dispute Nelson did not infringe upon any vested right of the railroad company; for there had not been, at the date of such occupancy in 1881, any definite location of the line of the railroad, and the land so occupied, with other lands embraced by the map of general route, constituted only a 'float'—the company having, at most, only an inchoate interest in them, a right to acquire them, if, at the time of definite location, it was not 'occupied by homestead settlers' nor incumbered with 'other claims or rights.' The withdrawal merely from 'sale or entry' in 1873, based only on a map of the general route of the road, did not identify any specific sections, was not expressly directed or required by the act of 1864, was made only out of abundant caution and in accordance with a practice in the land department, and did not and could not affect any rights given to homestead occupants by Congress in the acts of 1864 and 1880. Besides, the order made in 1873 to withhold from sale or entry all the odd-numbered sections falling within the limits of the general route was without practical value so far as the land in dispute was concerned; for such land had not been surveyed, and there could not have been any sale or entry of unsurveyed lands. At any rate, the order of withdrawal directing the local land office to withhold

from 'sale or entry' the odd-numbered sections within the limits of the general route could not prevent the occupancy of one of those sections prior to definite location by one who in good faith intended to claim the benefit of the homestead law; and this, because such right of occupancy was distinctly recognized by the act of 1864. But, if this were not so, the act of 1880, in its application to public lands which have not become already vested in some company or person, must be held to have so modified the order of withdrawal based merely on general route that such order would not affect any occupancy or settlement made in good faith, as in the case of Nelson, after the passage of that act, and prior to definite location. This conclusion cannot be doubted, because the act of 1880 made no exception of public lands covered by orders of withdrawal from sale or entry based merely on general route, and because, also, public lands, which had not become vested in the railroad company by the definite location of its line, were subject to the power of Congress."

The circumstance that in the Nelson Case Nelson filed upon the land claimed by him as soon as it was surveyed and the plat thereof returned to the land office was a circumstance which does not exist in the present one, for the reason that the land was still unsurveyed at the time of Lamlein's death, which circumstance, however, was not at all vital to the decision in the case of Nelson v. Northern Pacific Railway Company, which, as has been seen, was based solely upon the fact that at the time of the filing of the map of definite location of the road the land in question was in the possession of and improved by Nelson, with the bona fide intention on his part to acquire title thereto under the homestead laws.

The Commissioner of the General Land Office, as has been seen, based his ruling that the land here in controversy inured to the railroad company under its grant, upon the decision in Northern Pacific Railroad Co. v. Colburn, 164 U. S. 387, 17 Sup. Ct. 98, 41 L. Ed. 479, which case is clearly distinguishable from the present one by the fact that in that case the land was surveyed prior to the filing of the map of definite location by the railroad company, and, notwithstanding such survey, the occupant had not manifested the good faith of his occupation by entering or attempting to enter the land under the law. And this clear distinction was distinctly pointed out by the Supreme Court in the case of Nelson v. Northern Pacific Railway Company, at page 132 of 188 U. S., page 311 of 23 Sup. Ct. (47 L. Ed. 406), in its opinion, where it said:

"Nor is there any conflict between the decision now rendered and Northern Pacific Railroad v. Colburn, 164 U. S. 383, 17 Sup. Ct. 98, 41 L. Ed. 479; for, as appears from the opinion and record in that case, the land there claimed to have been occupied by a homestead settler at the date of definite location was surveyed public land, and the good faith of the occupation was not manifested by an entry, or an attempt at entry, at any time in the local land office. It was held that the inchoate right of the homesteader must be initiated by a filing in the land office. In the present case, as we have seen, the land occupied was unsurveyed, and at the time of such occupancy, the land being unsurveyed, there could not then have been any filing or entry in the land office."

See, also, in the same connection, Northern Pacific Ry. Co. v. McCormick, 94 Fed. 932, 36 C. C. A. 560.

For the reasons stated, we think it clear that the piece of land here in controversy was not embraced by the railroad company's grant, and that the patent was issued by the government to the company because

of the erroneous view of the law taken by the Commissioner of the Land Office.

The only other question requiring special notice is whether the appellant is entitled to a conveyance of the title thus passed by the patent. The record shows that, during his last illness in 1891, Lamlein sold his improvements upon the land to Trodick for a valuable consideration, and that the latter thereupon went into possession of the premises and continued to reside there, but did not apply to enter the land as a homestead until January 10, 1896, which application the land office refused solely because it held, as has been seen, that the land passed to the railroad company by virtue of its grant. And the court below based its ruling against appellant upon the ground that he did not file his application under the homestead law within 90 days after the filing of the township plat of August 10, 1891. But such delay on the part of the homesteader did not forfeit his right, except as against some one who had himself acquired or initiated a right. As has been seen, the requirement in respect to filing an application within 90 days after the return of the plat is, by the statute already referred to, applicable alike to pre-emption and homestead claims. In the case of Landsdale v. Daniels, 100 U. S. 113, 25 L. Ed. 587, each party claimed under Act March 3, 1853, c. 143, 10 Stat. 244, from which it appeared that unsurveyed as well as surveyed lands not exempted by the same act were subject to the pre-emption laws, with all the exceptions, conditions, and limitations expressed in such, unless otherwise expressed or provided, and, among other things, that where unsurveyed lands were claimed the usual notice of such claim should be filed within three months after the return of the plats of surveys to the land office. The land there in controversy being unsurveyed, the plaintiff made entry and settlement thereof November 1, 1853, and the defendant made entry and settlement on the same quarter section February 22, 1854. The precise date of the survey did not appear; but it did appear that the plats of the survey were returned into the local land office April 26, 1856, prior to which time, to wit, February 20, 1856, the defendant had filed his notice of claim or declaratory statement. Congress had provided that, where unsurveyed lands in the state in which the land in controversy was situated were claimed by pre-emption, the usual notice of such claim should be filed within three months after the return of plats of surveys to the land officer, and proof and payment should be made prior to the day appointed by the President's proclamation for the commencement of the sale of such lands. Declaratory statements under the original act might be made within three months after the return of the plats of surveys to the local land offices, which was effectual as a step to secure the right, if it was within one year from the passage of the act, which last provision was amended by a subsequent act and extended to settlements made prior to and within two years after the passage of the amendatory act (Act June 2, 1862, c. 90, 12 Stat. 410). The defendant's declaratory statement having been made prior to the return of the plats of surveys, instead of after, as required by the statute, was held by the court to be unauthorized and void. Still the defendant insisted that he was entitled to the patent to the land because the plaintiff did not file his de-

claratory statement until more than two years after the plats of the surveys of the land were returned into the local land offices instead of within three months, as required by the statute. The Supreme Court thus answered that contention:

"Grant that; but it only shows that both parties settled upon the land while it was unsurveyed, and that each was to some extent in fault in filing his declaratory statement; the difference being that the defendant filed his before he had any right to file it under the pre-emption act, which rendered it a nullity, and that the plaintiff did not file the required notice of claim until the time allowed by the amendatory act had expired. Such a notice, if given before the time allowed by law, is a nullity; but the rule is otherwise where it is filed subsequent to the period prescribed by the amendatory act, as in the latter event it is held to be operative and sufficient unless some other person had previously commenced a settlement and given the required notice of claim. Johnson v. Towsley, 13 Wall. 72, 91, 20 L. Ed. 485. Tested by that rule, it is clear that the equity of the plaintiff is superior to that of the defendant, as the latter never filed any other notice of claim than that which preceded the return of the plats of survey into the local land offices."

In the case of Whitney v. Taylor, 158 U. S. 85, 93, 96, 15 Sup. Ct. 796, 39 L. Ed. 906, the Supreme Court, having considered, among other things, the objection made that a claim made under the act of 1853 was not filed within three months after the return of the plats of surveys to the land offices, said:

"With reference to the second matter, it is true that section 6 of the act of 1853 (10 Stat. 246, c. 145) provides 'that, where unsurveyed lands are claimed by pre-emption, the usual notice of such claim shall be filed within three months after the return of the plats of surveys to the land offices.' But it was held in Johnson v. Towsley, supra, that a failure to file within the prescribed time did not vitiate the proceeding, neither could the delay be taken advantage of by one who had acquired no rights prior to the filing. As said in the opinion in that case (page 90 of 13 Wall. [20 L. Ed. 485]): 'If no other party has made a settlement or has given notice of such intention, then no one has been injured by the delay beyond three months, and if at any time after the three months, while the party is still in possession, he makes his declaration, and this is done before any one else has initiated a right of pre-emption by settlement or declaration, we can see no purpose in forbidding him to make his declaration or in making it void when made. And we think that Congress intended to provide for the protection of the first settler by giving him three months to make his declaration, and for all other settlers by saying if this is not done within three months any one else who has settled on it within that time, or at any time before the first settler makes his declaration, shall have the better right.' See, also, Landsdale v. Daniels, 100 U. S. 113, 117, 25 L. Ed. 587."

And the court proceeds to quote from the last-mentioned case the portion of the opinion hereinbefore set out.

The case of Landsdale v. Daniels also answers an objection made to the validity of the sale by Lamlein to Trodick of his improvements upon the land here in controversy. In Landsdale v. Daniels objection was made to the plaintiff's claim to the land on the ground that, instead of erecting a dwelling house on the land claimed by him, he purchased the dwelling house already there, in answer to which the court said:

"His entry and occupancy of the tract are admitted, and the court is of the opinion that it is immaterial whether he built the dwelling house himself, or hired an agent to erect it for him, or whether he purchased it after it was built by another, provided it appears that he was the lawful owner of the

dwelling house, and made the entry and settlement in good faith, and continued to occupy and cultivate the land, as required by the pre-emption laws. Enough appears to show that the dwelling house was there on the land, and that it was owned, possessed, and occupied by the plaintiff as his home more than three months before the defendant entered and attempted to make his settlement."

See, also, Bishop of Nesquallay v. Gibbon, 158 U. S. 155, 15 Sup. Ct. 779, 39 L. Ed. 931; Lamb v. Davenport, 18 Wall. 307, 21 L. Ed. 759.

A suggestion is made on the part of the appellees that the status of the land is to be determined solely by the condition of the records of the land office at the time of the filing of the map of the definite location of the company's road, and that, if it be permissible to prove by parol the fact of settlement, improvement, and residence upon the land in question by the homestead claimant, the railroad company might be deprived of a large part of its grant. Settlement, improvement, and residence are physical facts easily susceptible of proof, and good faith on the part of the claimant is exacted by the land department, as well as by the courts of justice. There is no more danger of their being erroneously decided in cases like the present than in any other case that comes before a court or tribunal depending for its decision upon facts. To a somewhat similar argument the Supreme Court, in the case of Whitney v. Taylor, 158 U. S. 95, 96, 15 Sup. Ct. 800, 801, 39 L. Ed. 906, said:

"Counsel urges that, inasmuch as the latter [a declaratory statement] need not be verified, one might file under assumed names declaratory statements on every tract within the limits of a railroad grant prior to the time of the filing of the map of definite location, and thus prevent the railroad company from receiving any lands. This danger is more imaginary than real. In the first place, for each application fees must be paid, and it is not to be supposed that any one would throw away money for the mere sake of preventing a railroad grant from having any operation. In the second place, such declaratory statements under assumed names would be purely fictitious and could be set aside as absolutely void. Indeed, good faith is presumed to underlie all such applications. The acceptance of the declaratory statement by the local land officers is prima facie evidence that they have approved it as a bona fide application, and if, in any particular instance, it is shown to be purely fictitious, doubtless there is an adequate remedy by proper proceedings in the land office. There is in the case before us no pretense that the transaction was a fictitious one, or carried on otherwise than in perfect good faith on the part of the applicant. At any rate, Congress has seen fit not to require an affidavit to a declaratory statement, and has provided for the filing of such unsworn statement as the proper means for an assertion on record of a claim under the pre-emption law, and that is all that is necessary to except the land from the scope of the grant."

When the grant of July 2, 1864, was made to the Northern Pacific Railroad Company, substantially the entire country between Lake Superior and Puget Sound was, as said by the Supreme Court in Nelson v. Northern Pacific Railway, supra,

"untraveled as well as uninhabited, except by Indians, very few of whom, at that time, were friendly to the United States. The principal object of the grant, as will appear from its language, was to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, by means of a railroad and telegraph; and to that end, and in order to bring the public lands into market, it was deemed important to encourage the settlement of the country along the proposed route. The public lands in that vast region were unsurveyed, and it was not known when they would be surveyed.

Congress, of course, knew that, if immigrants accepted the invitation of the government to establish homes upon the unsurveyed public lands, they would do so in the belief that the lands would be surveyed, that their occupancy would be respected, and that they would be given an opportunity to perfect their titles in accordance with the homestead laws."

In that case, as has been seen, the Supreme Court distinctly held that the settlement, improvements, and possession by Nelson of the land there in controversy, with a bona fide intention to acquire the government title thereto under the homestead laws, at the time the map of the definite location of the line of the Northern Pacific Railroad Company was filed, excepted the land so claimed from the grant; such land then being unsurveyed, for which reason there could not then have possibly been any record in the land office of the homesteader's claim.

The judgment is reversed, and the case remanded to the court below, with directions to give judgment for the complainant. .

MORROW, Circuit Judge (dissenting). In my opinion the question involved in this case has been clearly and distinctly decided by the Supreme Court of the United States in a number of cases. When the controversy between the land grant railroad companies and the settlers first arose with respect to lands within the place limits of the grant, it involved two questions: First, did the right of the railroad company attach to the odd-numbered sections described in the grant upon the fixing of the general route of the line of road, or upon the filing of the map of definite location of the line of road, in the land office? Second, did the right of the pre-emption or homestead settler attach upon the settlement upon the land, or upon his entry of the land in the land office? With respect to these two questions the law was declared to be that the opposing rights of the railroad company and an individual entryman were to be determined, not by the fixing of the general route of the road by the railroad company, or the mere occupation of the land by the pre-emption or homestead settler, but by the state of the record in the land office. On the part of the railroad company, its right did not attach to the lands within the place limits of the grant until it had definitely located the line of its road, as shown by the accepted map of its line of road filed in the land office; and on the part of the pre-emption or homestead settler, his right did not attach until he had made an entry of the land in the land office. Whichever of these acts was first in point of time was first in right. This was the state of the law until May 14, 1880, when Congress passed the act providing that a homestead settler on unsurveyed land should be allowed the same time to file his homestead application and to perfect his original entry in the land office as was then allowed to a pre-emption settler. 21 Stat. 140, c. 89 (U. S. Comp. St. 1901, p. 1392). This was a period of three months from the date of the receipt at the district land office of the approved plat of the township embracing the settlement. Under this act the settler on unsurveyed land had for the first time the right to enter land and have the entry relate back to the date of settlement, but such right was only acquired by complying with the statute.

In Kansas Pacific Railway Company v. Dunmeyer, 113 U. S. 629, 640, 5 Sup. Ct. 566, 28 L. Ed. 1122, the homestead entry was made July 25, 1866. The line of the definite location of the company's road was filed with the Commissioner of the General Land Office at Washington September 21, 1866. Referring to the filing of the map of definite location of the road, the court said:

"When the line was fixed, which we have already said was by the act of filing this map of definite location in the General Land Office, then the criterion was established by which the lands to which the road had a right were to be determined. Topographically this determined which were the 10 odd sections on each side of that line where the surveys had then been made. Where they had not been made, this determination was only postponed until the survey should have been made. This filing of the map of definite location furnished also the means of determining what lands had previously to that moment been sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim had attached; for by examining the plats of this land in the office of the register and receiver, or in the General Land Office, it could readily have been seen if any of the odd sections within 10 miles of the line had been sold, or disposed of, or reserved, or a homestead or pre-emption claim had attached to any of them."

Again, on page 641 of 113 U. S., page 571 of 5 Sup. Ct. (28 L. Ed. 1122), the court said:

"It is not conceivable that Congress intended to place these parties as contestants for the land, with the right in each to require proof from the other of complete performance of its obligation. Least of all is it to be supposed that it was intended to raise up, in antagonism to all the actual settlers on the soil, whom it had invited to its occupation, this great corporation, with an interest to defeat their claims, and to come between them and the government as to the performance of their obligations. The reasonable purpose of the government undoubtedly is that which it expressed, namely, while we are giving liberally to the railroad company, we do not give any lands we have already sold, or to which, according to our laws, we have permitted a pre-emption or homestead right to attach. No right to such land passes by this grant."

And again, on page 644 of 113 U. S., page 573 of 5 Sup. Ct. (28 L. Ed. 1122):

"Of all the words in the English language, this word 'attached' was probably the best that could have been used. It did not mean mere settlement, residence, or cultivation of the land; but it meant a proceeding in the proper land office by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation. With the performance of these conditions the company had nothing to do. The right of the homestead having attached to the land, it was excepted out of the grant as much as if in a deed it had been excluded from the conveyance by metes and bounds."

In Maddox v. Burnham, 156 U. S. 544, 546, 15 Sup. Ct. 448, 39 L. Ed. 527, the settler, Maddox, had gone upon the land in October, 1866, but made no attempt to enter it as a homestead until the succeeding spring, and after the withdrawals in favor of the railroad company had been ordered by the Secretary of the Interior. It appeared, however, that after Maddox and his father-in-law had gone upon the land the latter went to the land office for Maddox and himself to get permission from the register of the land office to go upon the land, put up houses, and live in them until the following spring, when they

would enter the land as homesteads. The register gave the permission, and under this permission they occupied the lands and made improvements, and when they went in the succeeding spring for the purpose of making their homestead entries they were told that the land had been withdrawn. Upon these facts the settler insisted that his equitable rights in occupying the land and placing improvements thereon antedated the withdrawals and were superior to the legal title. In denying these alleged equitable rights the Supreme Court said:

"This claim of the defendant cannot be sustained. At the time of these transactions the mere occupation of land, with a purpose at some subsequent time of entering it for a homestead, gave to the party so entering no rights. The law in force (Act May 20, 1862, c. 75, 12 Stat. 392), made the entry of the land office the initial fact. Section 1 authorized any one possessed of the prescribed qualifications 'to enter one quarter section, or a less quantity, of unappropriated public lands.' Section 2 provided that the person applying should, upon his application, make affidavit, among other things, 'that such application is made for his or her exclusive use and benefit, and that said entry is made for the purpose of actual settlement and cultivation, * * * and upon filing the said affidavit with the register or receiver, and on payment of $10, he or she shall thereupon be permitted to enter the quantity of lands specified.' So the law stood until May 14, 1880 (21 Stat. 141, c. 89 [U. S. Comp. St. 1901, p. 1393]), when an act was passed, the third section of which is as follows: 'Sec. 3. That any settler who has settled, or who shall hereafter settle, on any of the public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the United States land office, as is now allowed to settlers under the pre-emption laws to put their claims on record, and his right shall relate back to the date of settlement, the same as if he settled under the pre-emption laws.'"

The court, in referring to the settler's occupation of the land, said:

"It is true that he claims that he had permission from the register of the land office to go upon the land and occupy it; but the register had no power to give such permission. He had no general control over the unappropriated public lands. He could vest no rights, legal or equitable, in any individual other than such as are authorized by statute. His authority was limited to receiving and acting upon applications for homestead or pre-emption entry, and it cannot be that any such unauthorized permission of a local land officer can create a right not given by the statute, or defeat a title conveyed by the government in full compliance with the law."

In Tarpey v. Madsen, 178 U. S. 215, 222, 20 Sup. Ct. 849, 44 L. Ed. 1042, the subject was again reviewed by the Supreme Court and it was held that the opposing rights of an individual entryman to the railroad company were to be determined by the state of the record in the land office. Whether the court intended to say that the act of May 14, 1880, to which reference was made, applied only to a controversy between individual occupants of the land, and not to a controversy between an individual entryman and the railroad company, is immaterial in this case, in view of later decisions. What the court said was this:

"It is undoubtedly true that one occupying land with a view of pre-emption is given 30 days within which to file with the register of the land office his declaratory statement (Rev. St. § 2264), and since 1880 the same right has been possessed by one desiring to make a homestead entry (Act May 14, 1880, c. 89, § 3, 21 Stat. 141 [U. S. Comp. St. 1901, p. 1393]). So that any controversy between two occupants of a tract open to pre-emption and homestead entry is

not determined by the mere time of the filing of the respective claims in the land office, but by the fact of prior occupancy, and these controversies are of frequent cognizance. Oral evidence, therefore, of the date of occupancy, may be decisive of the controversy between such individual applicants for a tract of public land, but by decisions of this court, running back to 1882, as between a railroad company holding a land grant and an individual entryman the question of right has been declared to rest not on the mere matter of occupancy, but upon the state of the record."

Again, on page 227 of 178 U. S., page 853 of 20 Sup. Ct. (44 L. Ed. 1042), the court said:

"And surely Congress, in making a grant to a railroad company, intended that it should be of present force, and of force with reasonable certainty. It meant a substantial present donation of something which the railroad company could at once use, and use with knowledge of that which it had received. It cannot be supposed that Congress contemplated that, as in this case, a score of years after the line of definite location had been fixed and made a matter of record, some one should take possession of a tract apparently granted, and defeat the company's record title by oral testimony that at the time of the filing of the map of definite location there was an actual, though departed, occupant of the tract, and therefore that the title to it never passed."

In Northern Pacific Railroad Company v. Colburn, 164 U. S. 383, 17 Sup. Ct. 98, 41 L. Ed. 479, it was distinctly held that mere occupation of land by a homestead settler, unaccompanied by a filing of the claim in the land office, did not exclude a tract from the operation of the grant to the railroad company. It is true that the land there claimed to have been occupied by the homestead settler at the time of the definite location of the line of the railroad was surveyed public land. In the present case the land was unsurveyed, but under Act May 14, 1880, c. 89, 21 Stat. 140 (U. S. Comp. St. 1901, p. 1392), and section 2266 of the Revised Statutes the homestead settler was allowed three months after the receipt of the plat of survey at the district land office to file his homestead application. If he filed this application within this time it was provided that "his right should relate back to the date of the settlement, the same as if he settled under the pre-emption laws." It was only upon complying with this statute that the previous occupation of unsurveyed land by the homestead settler was recognized as "a claim." If he failed to comply with the statute, his occupation of the land at the time of the definite location of the line of road was precisely the same as though the land had been surveyed at the time of such location and he had failed to make his claim of record in the land office at that time. The land would not be excluded from the grant. In this case, in referring to the decision of the Supreme Court of Montana, the court said:

"And if it be true, as matter of law, that mere occupation or cultivation of the premises at the time of the filing of the map of definite location, unaccompanied by any filing of a claim in the land office then or thereafter, excludes the tract from the operation of the land grant, the decision of the Supreme Court of Montana was right. But frequent decisions of this court have been to the effect that no pre-emption or homestead claim attaches to a tract until an entry in the local land office."

The decision in the case of Nelson v. Northern Pacific Railroad Company, 188 U. S. 108, 23 Sup. Ct. 302, 47 L. Ed. 406, is not in conflict with these prior decisions. The railroad grant under considera-

tion in that case was the same as in the present case. The railroad company had fixed the general route of its road extending coterminous with the land in controversy and within 40 miles thereof by filing a plat of such route with the Commissioner of the General Land Office on August 20, 1873. It had also definitely located the line of its railroad coterminous with and within less than 40 miles of the land on December 6, 1884. Three years prior to the latter date Nelson, who was then conceded to have been qualified to enter public lands under the homestead act, went upon and occupied the land in controversy and continued to reside thereon. The land was not surveyed until 1893, but as soon as it was surveyed he attempted to enter it under the homestead laws of the United States. His application was rejected solely because, in the judgment of the local land office, it conflicted with the grant to the Northern Pacific Railroad Company. The opinion of the court, by Mr. Justice Harlan, reviews previous decisions of the Supreme Court and the Department of the Interior for the purpose of determining whether the railroad company acquired a vested interest in the, land upon the fixing of the general route of the road opposite the land in controversy on August 20, 1873, or when the line of the road was definitely located on December 6, 1884. From this review the court reached the conclusion that the railroad company acquired no vested interest in any particular section of land until after the definite location of the line of its road had been made, as shown by the accepted map of its line filed in the land office on December 6, 1884. Three years prior to the latter date, as before stated, Nelson had gone upon and occupied the land as a homestead settler, and the court was of opinion that:

"His continuous occupancy of it, with a view, in good faith, to acquire it under the homestead laws as soon as it was surveyed, constituted * * * a claim upon the land within the meaning. of the Northern Pacific act of 1864."

In another place the court says:

"He [Nelson] acted with as much promptness as was possible under the circumstances."

Again:

"The settler waited from 1881 to 1893 for the land to be surveyed, and as soon as that was done he attempted to enter it under the homestead law in the proper office."

The court, referring to the provisions of the act of May 14, 1880, says:

"Nelson settled on unsurveyed public land, in which the railroad company had no vested or specific interest, and the third section of the act of 1880 was purposeless, if it did not allow him to perfect his title under the homestead laws *as soon as the land was surveyed.*"

The last five words of this quotation are italicized by the court to emphasize the fact that Nelson had his claim of a homestead on record in the land office in accordance with the provisions of the act of 1880, thus making the entry relate back to the occupation of the land by him and giving him a right prior to the definite location of the road.

At the same term of the court at which the Nelson Case was decided the Supreme Court decided the case of Oregon & California Railroad Company v. United States, 189 U. S. 103, 23 Sup. Ct. 615, 47 L. Ed. 726. The opinion of the court was also by Mr. Justice Harlan. The controversy in that case involved the construction of the grant to the California & Oregon Railroad Company (Act July 25, 1866, c. 242, 14 Stat. 239), the terms of which, so far as the present question is concerned, are substantially the same as those of the Northern Pacific Railroad grant. In that case, as in the Nelson Case, the railroad company had received patents from the United States under its grant to the lands in dispute. That case involved lands within the indemnity limits of the railroad grant. The lands had been occupied for a number of years previous to the completion of the survey by the homestead settlers. Immediately upon the completion of the survey, and before any claims by the homestead settlers had been filed, the railroad company selected the lands as part of its grant. After such location, but within the 90 days allowed by the act of May 14, 1880, applications to enter the lands as homesteads were made by the occupants of the lands. The court held that the rights of the occupants under the circumstances were superior to those of the railroad company, on the ground that after the lands had been surveyed the settler had promptly taken the necessary steps to protect his rights under the homestead laws. The court says:

"But it is contended that, as the selection by the company * * * was prior to the application by the respective settlers for entry under the homestead laws, its right to the lands in question was superior to that asserted by the settlers. This view is completely met by the fact that the settler, by prior occupancy in good faith, could avail himself of the homestead acts whenever, by an official survey, the way is opened by the government for him to do so, and by the fact that, within 90 days after these lands were surveyed, he filed in the proper office his application to enter them under the homestead laws of the United States. He moved with due diligence to protect and perfect the right acquired by his occupancy of the land with the intention to avail himself of the benefit of those laws. That right was not to be affected or impaired by the fact that the lands were not surveyed at the date of occupancy. Nelson v. Northern Pacific Railway, above cited; Ard v. Brandon, 156 U. S. 537, 543, 15 Sup. Ct. 406, 39 L. Ed. 524; Tarpey v. Madsen, 178 U. S. 215, 219, 20 Sup. Ct. 849, 44 L. Ed. 1042. * * * In the Tarpey Case it was said that 'the right of one who has actually occupied [pubic lands] with an intent to make a homestead or pre-emption entry cannot be defeated by the mere lack of a place in which to make a record of his intent,' and that if a settler was in possession before definite location, 'with a view of entering it as a homestead or pre-emption claim, and was simply deprived of his ability to make his entry or declaratory statement by the lack of a local land office, he could undoubtedly, when such office was established, have made his entry or declaratory statement in such way as to protect his rights.' So, if the condition of the lands, being unsurveyed, prevents the making by a bona fide occupant of a proper application of record to enter them under the homestead laws his rights will not be lost, if, after the lands are surveyed, he applied in due time to enter the lands under those laws. And such has been held to be the object and effect of Act May 14, 1880, c. 89, 21 Stat. 140 (U. S. Comp. St. 1901, p. 1392)."

The contention of the appellant that the opinion of the Supreme Court in these cases must be construed in the light of the opinion of the court in the case of Northern Pacific Railroad Company v. Sanders, 166 U. S. 620, 17 Sup. Ct. 671, 41 L. Ed. 1139, may be admitted;

but such a construction does not change the law with respect to the question now under consideration. In the Sanders Case the Northern Pacific Railroad Company brought suit to recover possession of an odd-numbered section within the primary limits of its grant. Prior to the definite location of the line of its railroad opposite to and past the section of land in dispute, certain persons qualified to enter mineral lands under the laws of the United States entered upon the land in controversy and filed upon it as mineral land, applying for patents therefor and conforming in all respects to the provisions of the laws of the United States relating to "mineral lands and mining resources." Applications for these lands as mineral lands were pending in the land office undetermined at the time the railroad company filed its map of definite location. The defendants, who subsequently entered into the possession of the lands, did not assert title in themselves at the time of the definite location of the line of railroad, but resisted the claim of the railroad company upon the ground that the lands were excluded from its grant by reason of the fact that there were claims to the lands pending in the land office at the time of the definite location of the road. The claims consisted, as stated, in the application of certain persons to purchase the lands as mineral lands. The lands were not in fact mineral lands, and it does not appear what became of the applications. The court, in commenting upon this feature of the case, said:

"As the lands in question were not free from those claims at the time the plaintiff definitely located its line of road, it is of no consequence what disposition was or has been made of the claims subsequent to that date."

The court accordingly held that the lands did not pass to the railroad company by the terms of the grant, for the reason that claims to the land were pending in the land office at the time of the definite location of the road. The distinction to be drawn between that case and the one at bar is the fact that in the former case the applications to purchase the land as mineral land were on file and pending in the land office undetermined when the line of definite location of the road was fixed, while in the present case no such application was pending, nor, under the law, was it permissible for the homestead settler to make application for a homestead upon unsurveyed land. As said by the Secretary of the Interior in Southern Pacific Railroad Co. (Branch) v. Lopez, 3 Land Dec. Dep. Int. 130, 131, cited as authority in Nelson v. Northern Pacific Railway Company, supra:

"Under the homestead law it is the 'entry' which reserves land (except for the short period during which it is reserved by settlement under the act of May 14, 1880), and not any occupation by the claimant before or after it."

In Sturr v. Beck, 133 U. S. 541, 547, 10 Sup. Ct. 350, 352, 33 L. Ed. 761, decided in 1890, the Supreme Court held that:

"A claim of the homestead settler * * * is initiated by an entry of the land, which is effected by making an application at the proper land office, filing the affidavit, and paying the amounts required by sections 2238 and 2290 of the Revised Statutes (U. S. Comp. St. 1901, pp. 1367, 1389)."

It appears that on July 6, 1882, the Northern Pacific Railroad Company filed with the General Land Office its map of definite location

of the line of said railroad, coterminous with and within less than 40 miles of the land in controversy. One Martin Lamlein settled upon the land in the year 1877, and continued to reside thereon until his death in August, 1889. During this time the land was unsurveyed, and therefore not open to entry as a homestead. Preceding Lamlein's death the appellant succeeded to Lamlein's possessory right by purchase or an agreement to purchase the improvements on the land. The appellant has since continued to reside upon the land. The land was surveyed in 1891, and the township plat of the survey embracing it was filed in the land office August 10, 1891. No attempt was made to enter the land by any one until June 29, 1896, when the appellant applied to make a homestead entry. There was, therefore, no entry of record in the land office at the time of the definite location of the line of the railroad, and no entry was made within three months from the date of the receipt at the district land office of the approved plat of survey of the township embracing the land, under the provisions of the act of May 14, 1880. The land was, therefore, free from any homestead claim or right, and the title passed to the railroad company under the grant.

It is contended further by appellees that Lamlein was not a qualified entryman and that his occupation of the land at the time of the definite location of the line of railroad did not exclude it from the grant to the railroad company for the following reasons: (1) It is not shown that Lamlein was a citizen of the United States. (2) It is not shown that Lamlein was not the proprietor of more than 160 acres of land in any state or territory of the United States. (3) It appears from the evidence that prior to Lamlein's death he had sold or agreed to sell whatever right he had to the land to the appellant. It is contended that under section 2290 of the Revised Statutes, as amended by Act March 3, 1891, c. 561, § 5, 26 Stat. 1095, 1096 (U. S. Comp. St. 1901, p. 1389), this act amounted to an abandonment of the land. It would seem that either of these objections would be sufficient to defeat Lamlein's homestead claim.

In my opinion the decree of the Circuit Court should be affirmed.