## UNITED STATES v. OREGON & C. R. CO. et al.

(District Court, D. Oregon. September 15, 1925.)

### No. 7699.

**1. Constitutional law ⬅⇒278(1)—Public lands ⬅⇒88(1)—Act requiring accounting for proceeds of lands sold by railroad in violation of grant held constitutional.**

The Oregon & California Railroad Company and its predecessors having violated the terms of the land grant act by refusing to sell to settlers at $2.50 per acre, the purpose of the Chamberlain-Ferris Act of June 9, 1916, revesting in the United States title to all lands not sold prior to July 1, 1913, and requiring the company to account for all receipts from the lands granted, was to secure to the company the full value of the grant, which was $2.50 per acre for the lands to which it was entitled, and to require it to pay over the excess, if any, which it had received, and to which it was not entitled, and such requirement does not violate its constitutional rights.

**2. Public lands ⬅⇒88(1)—On accounting for proceeds of lands sold by railroad in violation of grant, railroad could not insist on reimbursements for expenditures.**

The railroad company, being assured by the act of receiving the full value of all the granting act conferred, cannot now insist that it be reimbursed for the cost of administering the grant, nor for taxes paid on the lands patented to it on the supposition that it would observe its covenants, and while it claimed title thereto.

**3. Public lands ⬅⇒88(1)—Railroad, on accounting, not chargeable with taxes on lands forfeited under railroad grant on valuation exceeding its interest.**

As to taxes paid subsequent to July 1, 1913, as of which date title revested in the United States, and before passage of the revesting act, the company cannot equitably be charged in the accounting on a valuation in excess of $2.50 per acre, which was the value of its interest therein.

**4. Public lands ⬅⇒88(1)—Items included in accounting, on forfeiture of railroad grant, stated.**

On such accounting the company is required to account, not only for the proceeds of sales of lands and timber therefrom, but also for sums received for rentals and on forfeited contracts, and as deferred payments on land and timber sales in violation of the grant, and for the value of timber used by the company, not taken under authority of any act of Congress.

**5. Public lands ⬅⇒88(1)—On forfeiture of railroad grant, railroad held entitled to credit for judgments.**

The company having been subjected to judgments in state trial courts for $2.50 per acre received for lands sold to lumber companies in violation of the grant, for which the purchasers were required to pay the United States, is entitled to credit therefor on the accounting, contingent on affirmance of the judgments by the appellate courts.

**6. Public lands ⊛≈81(2)—Grant does not attach to indemnity lands until selection made.**

As pertains to indemnity lands under a railroad or similar grant, the grant is in the nature of a float, and does not attach unless and until a selection is actually made and in the manner provided.

**7. Public lands ⊛≈91—Rights as between conflicting grants determined by dates of grants.**

As between conflicting grants, the prior rights of the grantees or their successors in interest are referable to and dependent on the dates of the respective grants and not on the dates of definite location.

**8. Public lands ⊛≈91—Wagon road grant held effective as against subsequent overlapping railroad grant.**

A grant of lands for a wagon road of three odd-numbered sections per mile, to be selected within six miles of the road, is in effect a grant in place with a quantity selection, and on location of the road and withdrawal from sale of the lands within the six-mile limits, the grant is effective as to all the lands within such limits, as against a subsequent overlapping railroad grant in place, though the specific sections passing thereunder had not been selected at the time of the definite location of the railroad.

**9. Public lands ⊛≈75—Lands excepted from grant when it becomes effective do not pass thereunder, though prior rights are subsequently abandoned.**

Where rights acquired in public lands, which, under its terms, except such lands from a grant at the time it becomes effective, are subsequently abandoned or lost, the lands do not pass under the grant, but revert to the public domain.

**10. Public lands ⊛≈88(1)—Forfeiture of grant for nonobservance of conditions subsequent not self-executing.**

Forfeiture of a railroad or similar grant because of nonobservance of a condition subsequent is not self-executing, but requires some action by the government to enforce forfeiture, and third parties cannot insist on a breach of the condition and acquire rights on that assumption.

**11. Public lands ⊛≈91—Railroad company held entitled to compensation for lands within grant erroneously patented to another.**

Where a railroad grant was prior in date to a wagon road grant, and contained no reservations referable to the time of definite location, and lands within the conflicting limits of the two grants were erroneously patented to the road company because of prior definite location, the railroad company is entitled to compensation for the lands so lost, on an accounting, and its right is not defeated by the fact that it selected indemnity lands in lieu of some of them, where the lands within its indemnity limits were insufficient to meet its deficiencies in place.

**12. Public lands ⊛≈91—Selection of indemnity lands held not necessary in case of conflicting grants.**

As between conflicting grants, where the deficiency within the primary limits of one of them is so great that the indemnity lands will not make good the loss, no formal selection is necessary for acquiring title as against a later grant; but this exception to the general rule that the first to select is the first in right is not applicable where the rights of settlers are involved.

**13. Public lands ⊛≈81(1)—Adjustment of grant necessary to determine deficiency within place limits.**

Before there can be a determination that the lands within the indemnity limits of a railroad grant are insufficient to make good a deficiency within the primary limits, so as to relieve the company from the necessity of making selection, it is necessary that there should be an adjustment of the grant by the Secretary of the Interior with respect to its place limits.

**14. Public lands ⊛≈91—Facts necessary to defeat right to make first selection from conflicting indemnity grants stated.**

Where a conflict existed between the indemnity grants to a railroad company and a wagon road company, though the railroad grant was prior in date, in order to defeat the right of the road company to lands first selected by and patented to it within the conflicting area, it must be shown that at the time of selection there was such deficiency in the place grant to the railroad company that there was not sufficient land within its indemnity grant to make good the loss, and that that the road company had notice of the fact.

**15. Public lands ⊛≈91—As between conflicting indemnity grants, first in selection is first in right.**

A provision in a grant for a wagon road, reserving from its operation lands theretofore reserved or appropriated, *held* not to affect the rule that, where the indemnity limits of two grants overlap, the first in time of selection is first in right, irrespective of the date of the grants.

**16. Public lands ⊛≈81(1)—Indemnity lands required to make good a railroad grant not subject to other disposition by Congress.**

Where the lands within the indemnity limits of a railroad grant, at the time of definite location of the road, were not sufficient to make good the losses of lands in place, the government is chargeable with knowledge of the fact, and Congress was without authority to otherwise dispose of lands within the indemnity limits, even though selections had not been made by the railroad company.

In Equity. Suit by the United States against the Oregon & California Railroad Company and others for accounting by the Railroad Company. Accounting made.

S. W. Williams, Sp. Asst. U. S. Atty., of Washington, D. C.

Ben C. Dey, Alfred A. Hampson, and Geo. L. Buland, all of Portland, Or., for defendants Oregon & C. R. Co., Southern Pacific Co., and Charles H. Redington.

Dolph, Mallory, Simon & Gearin and John M. Gearin, all of Portland, Or., and Miller, King, Lane & Trafford, of New York City, for defendant Central Union Trust Co.

WOLVERTON, District Judge. This is a suit against the railroad company for an accounting under the Act of Congress approved June 9, 1916 (39 Stat. 218), commonly known as the Chamberlain-Ferris Act. Under the provisions of this act, it is declared that title to all lands comprised by the previous grants of Congress to the predecessors of the Oregon & California Railroad Company not sold prior to July 1, 1913, "be and the same is hereby revested in the United States." By section 7 of the act the Attorney General is authorized and directed by appropriate action "to have determined the amount of moneys which have been received by the said railroad company or its predecessors from or on account of any of said granted lands, whether sold or unsold, patented or unpatented, and which should be charged against it as a part of the 'full value' secured to the grantees under said granting acts as heretofore interpreted by the Supreme Court." The section then specifies what the court shall "take into consideration and give due and proper legal effect to."

While the revesting is of the lands unsold, this section is pregnant with the thought, since an accounting is required of the railroad company for all moneys received on account of the granted lands, whether sold or unsold, which should be charged against it as a part of the full value, that incidentally it was the purpose and intendment of the act that the railroad company should be paid, acre for acre, at the rate of $2.50 per acre, for all lands comprised by the grant to which it was entitled. The sum total thereof would constitute the "full value" that it was designed the company should receive on account of the revesting. Such being the thought and purpose, it becomes a matter of inquiry for ascertaining the exact acreage to which the railroad company was and is entitled as of right under its grants, and thereby determining the aggregate of the "full value," as declared by the Supreme Court.

[1] The first contention is that the railroad company should not be required to account for moneys received by it for lands within the grant prior to July 1, 1913, and that to require such accounting is unconstitutional and beyond the power of congressional enactment. The Supreme Court, in the case of Oregon & Cal. R. R. Co. v. United States, 238 U. S. 393, 438, 35 S. Ct. 908, 50 L. Ed. 1360, after declaring that the "settlers" clauses in the grants in question were not conditions subsequent, but enforceable covenants, and that the railroad company had on its part violated such covenants, virtually referred the whole matter to Congress for disposition in accordance with such policy as it should deem fitting in view of the situation, "and at the same time secure to the defendants all the value the granting acts conferred upon the railroads." The value that the granting acts conferred was not to exceed $2.50 per acre of the lands granted, and to which they were entitled, allowing for previous conflicting grants and accrued vested rights, private and otherwise, in diminution of the grants. The policy of the Chamberlain-Ferris Act and the Congress was and is to secure to the railroad company this value as comprising all the value to which it is entitled under the grants, the company having violated and refused to observe its covenant to sell to actual settlers at the price fixed by the granting acts. There was reserved by the granting act of 1866 the right in Congress to add to, alter, amend or repeal, having due regard to the rights of the grantee company.

It is obvious that the railroad company ought not to be permitted to profit by its own inalertness in observing the conditions and mandates of the grants. The grants, as has been many times repeated during the litigation respecting them, are laws as well as contracts. The railroad company was without authority so to handle them as to appropriate to itself larger sums than would accrue to its benefit through the substantial observance of the injunctions thereof. What it so appropriated was no more its money than if it had sold land of the public domain, and used the price exacted for its own uses and purposes. It was with these funds, accumulated through unauthorized and unlawful exactions, that the Chamberlain-Ferris Act dealt when it required an accounting.

The theory of the act is that the railroad company should account to the government for these moneys received by it to which it was not entitled, while the government at the same time obligated itself to pay to the railroad company the full value, namely, $2.50 per acre, for every acre of land to which it was entitled under the grants. There was in this no taking away from the

railroad company of anything of value that was rightfully its due, nor was there any violation of the due process of law clause of the Constitution.

It should be observed here that no relation of trustee and cestui que trust exists between the railroad company and the United States. This is a plain suit in accounting, as was intended by the act, to determine as between the railroad company and the government the present status of the account; the government to pay the full value of the lands granted to which the railroad is entitled, and the railroad company to pay to the government the excess it has received over and above the full value. The first contention must therefore be denied.

[2] It is insisted upon the part of the railroad company that it should be allowed its expenses, including taxes paid, for administering the grant. These expenses amount to a very large sum of money, and have been accumulating almost from the time the grants were made. These grants were of the fee, accompanied by an enforceable covenant, namely, that the lands should be sold by the grantee to actual settlers only, in quantities not greater than one quarter section to a purchaser, and for a price not exceeding $2.50 per acre. Patents to large areas of the land were afterwards issued to the railroad company in fee-simple title; the government depending upon the railroad company to observe its covenants. The title being thus vested, both by the grants and by the patents afterwards issued, the burden of administering the grants was placed upon the railroad company, and this in pursuance of its covenants. No one concerned in the grants, including the government, ever thought that they would be otherwise administered than by the railroad company, and for many years the parties proceeded upon this hypothesis. It is not now questioned that the burden from the beginning rested upon the railroad company. But for the revesting of the unsold lands in the government, that question would never have arisen. But since there has been a breach of the covenants, and the government has become revested with the lands, the question is raised that, since the government always did have a residuary interest in the value of the grants in excess of $2.50 per acre, it should respond to the entire cost, or some part at least, of administration, though by the railroad company.

By the decision in Oregon & Cal. R. R. v. United States, supra, and later by the act of 1916, the railroad company is assured of all the value the granting acts conferred. This embraces, as we have seen, the entire grants—the whole acreage comprised thereby, including the portions which were sold for less, as well as those which were sold for more than $2.50 per acre, so that the railroad company is receiving the "full value" of the lands when it receives $2.50 per acre for the entire grants, as contemplated by Congress. If the railroad company had observed its covenants rigidly or substantially, it would not have been entitled to more, though burdened with the costs of administration. Manifestly, it cannot claim or be entitled to more by reason of having breached its covenant. It may be that, owing to the fact that a large proportion of the lands was unfit for settlement, the covenants were unsusceptible of being observed, even substantially, yet the company in 1903 declared its purpose of nonobservance of the covenant, and actually withdrew all the lands from sale. It might be that, by proper application to Congress, it would have been relieved of a part, if not the greater portion, of this expense, but it could not consistently have so applied, and at the same time claimed full title, as it did, to the lands comprised by the grants. Nevertheless, it remained quiescent, and continued the administration on its own account, cognizant, as it must have been, of all the conditions subsisting and obligations imposed upon it and accepted by it.

The taxes paid prior to 1913 need special mention. True, these taxes, in large part, were levied at a greater valuation than $2.50 per acre, the interest that the railroad company possessed in the lands. But they were paid by the company, not under protest, which it could rightfully have made, but voluntarily, while claiming full title to the lands and the entire interest therein. The company could not consistently have been relieved of these taxes while claiming full title in the property assessed to it. United States v. Southern Oregon Co. (C. C.) 196 F. 423. Upon the whole, therefore, the railroad company is not entitled to its expenses of administration, including taxes paid, whether upon levies of values at less or greater than $2.50 per acre, prior to 1913.

[3] Subsequent to, and inclusive of, 1913, 1914, and 1915, other taxes were paid, under the mandate of the Chamberlain-Ferris Act, by the government, which were levied at a valuation much in excess of $2.50 per acre. These were paid in disregard of the protest of the railroad company, made after the question of forfeiture or revesting had aris-

en. The railroad company was assessable only to the extent and upon a valuation of $2.50 per acre and no more. Nehalem Timber Co. v. Columbia County, 97 Or. 100, 189 P. 212, 191 P. 318. The government knew this as well as the company, and the bare fact that no attempt was made with the assessing authorities to have the assessment and levy of taxes relieved against does not alter the situation. The government's interest in the lands was simply nonassessable by the state. It was a mistake of law, not of fact, to attempt to assess such interest to the railroad company, and such assessment was void at any stage and in any event.

The whole sum paid for these three years by the government was $1,569,929.15. The amount for which the railroad company was liable at a valuation of $2.50 per acre was $257,715.32. The railroad company in equity ought not to be required to reimburse the government for the difference, namely, $1,312,213.83. The Clark county, Wash., assessment is subject to the same rule, and the railroad company will not be required to reimburse the government for taxes paid by it in the further sum of $1,086.96.

[4] The railroad company contests the right of the government to claim from the company the proceeds of land sales made by it, of timber sales, timber depredations, rentals, interest on deferred payments on sales contracts, interest on deferred payments on timber sales, and the value of timber used in the railroad. The situation will be best understood from the summary (item 16, agreed statement of facts, as corrected by Exhibit 1 read into the testimony of B. A. McAllaster, at page 107), of the claims made by the government and which are questioned. It is as follows:

| | |
|---|---|
| (a) Sales of lands | $3,989,991.80 |
| (b) Sales of timber | 20,770.25 |
| (c) Recoveries for timber depredations | 18,051.18 |
| (d) Rentals | 10,540.46 |
| (e) Received on forfeited contracts | 113,436.49 |
| (f) Interest on deferred payments for lands | 1,038,411.57 |
| (g) Interest on deferred payments for timber | 671.75 |
| (h) Value of timber used in railroad | 50,373.00 |

Total receipts from all sources $5,242,246.50

The court having heretofore concluded that the Chamberlain-Ferris Act is valid as respects the requirement of the company to account for receipts of moneys for lands disposed of by it in disregard of its covenants, the company on that hypothesis con-cedes that the first three items are properly chargeable against it.

It is quite obvious that the succeeding four items are also properly chargeable to the company. The moneys received, as shown by the summary, arose, although indirectly, out of the corpus or estate embodied by the grants, without which they could not have been earned, and inured to the benefit or enrichment of the company. I assume that the receipts on forfeited contracts and the interest on deferred payments on sale contracts of lands and timber all pertained to contracts made in disregard of the enforceable covenants of the grants, and not from sales in conformity therewith; otherwise, that the stipulation of facts would have so indicated.

A more particular inquiry is necessary respecting the last item, being item (h). This pertains to timber "used in railroad." By reference to item 16 of the agreed statement of facts, the claim shows, as it relates to item (h) of the summary, "the value of timber taken from the granted lands and used by the Oregon & California Railroad Company, Southern Pacific Company, or their predecessors."

The granting act of 1870 (16 Stat. 94) excepts from the authorization to sell the lands comprised by the grant, "such as are necessary for the company to reserve for depots, stations, side tracks, woodyards, standing ground, and other needful uses in operating the road." The 1866 grant (14 Stat. 239) contains no such declaration, but section 10 thereof provides: "That all mineral lands shall be excepted from the operation of this act; but where the same shall contain timber, so much of the timber thereon as shall be required to construct said road over such mineral land is hereby granted to said companies." The Act of March 3, 1875 (Comp. St. § 4921), grants to any railroad company which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, etc., "the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad."

It is submitted that, in pursuance of these provisions of the granting acts and of the Act of March 3, 1875, it was proper and lawful to use the timber as specified in item 16 (h) of the stipulation of facts. It is clear that the granting acts conferred no such authority. Section 10 of the act of 1866 gives authority to take timber from mineral lands over which the road might

pass, for construction of the road thereacross, and the Act of March 3, 1875, confers the right to take timber necessary for construction purposes from lands adjacent to the line of road. The stipulation does not show that the timber taken for which claim is made was taken for any such purposes, but merely that it was used by the railroad companies and their predecessors. It follows that the railroad company is liable for this item also, and the same is properly chargeable against it in the accounting.

[5] Another feature of this suit pertains to two actions, one by Hammond and Winton and the other by Booth-Kelly Lumber Company, to recover from the railroad company, the former at the rate of $2.50 per acre for lands purchased from the railroad company under contract of sale, and the latter for the full amount of the purchase price of the lands sold, which exceeded $2.50 per acre. Suits had been previously instituted by the Attorney General under the Act of August 20, 1912 (37 Stat. 320), known as the Innocent Purchasers Act, for a forfeiture of the lands covered by these contracts, and in pursuance of the provisions of the act the purchasers were allowed to retain title to the lands on payment of $2.50 per acre to the government, which was done, and the title accordingly confirmed in such purchasers. Plaintiffs in the actions instituted as above indicated were successful in the state courts, and have recovered judgments against the railroad company for the sales price of the land sold to the extent of $2.50 per acre. These cases are now on appeal to the Supreme Court of the state. Whether the railroad company will eventually have to pay these judgments depends upon the action of the state Supreme Court, and possibly the federal Supreme Court; but for the present it is obligated to respond to the judgments. It is submitted whether, if the railroad company pays these judgments, it should have credit for the amounts thereof in the accounting. It would seem, in equity and good conscience, that it should. It received in the first place from the purchasers $2.50 per acre, but, if that is taken away from it, it would be denied the full value of the lands, unless the government reimbursed it to that extent. The acreage in the Hammond and Winton purchase is 45,972.43, and in the Booth-Kelly Company purchase 19,283.71. The value of both, at $2.50 per acre, is $163,140.35. The railroad company is entitled to credit in the accounting for this amount, contingent upon whether it shall succeed in reversing the judgments in the appellate courts. The decree will be drawn to take care of such contingency. The company is not entitled to interest on the receipts of $2.50 per acre of the sales, nor to attorney's fees in defending the actions.

We come now to a consideration and determination of the acreage included within the two grants on which the railroad company is entitled to compensation at the rate of $2.50 per acre. It is stipulated (item 12, agreed statement of facts): (a) That there were comprised within the primary limits of the grants 4,218,902.69 acres. (b) Of this acreage, there has been properly patented to the railroad company 1,913,672.50 acres. (c) That 1,943.19 acres were erroneously patented to individuals. (d) That 285,562.95 acres are under consideration by the Department of the Interior, for determining whether the company is entitled to patent. (e) That 123.78 acres within the limits of the Corvallis and Yaquina Bay wagon road have been patented to the Oregon & California Railroad Company. (f) That 40 acres within the limits of the grant to the Willamette Valley and Cascade Mountain wagon road have been patented to the Oregon & California Railroad Company. (g) That 14,221.03 acres within the six-mile or indemnity limits of the Coos Bay wagon road grant have been patented to the wagon road company. (h) That 19,735.37 acres within the three-mile or primary limits of the Coos Bay wagon road grant have been patented to the road company. Of this acreage the railroad company has used 16,974.45 acres as base for indemnity selection. (i) That 8,874.89 acres within the three-mile or primary limits of the Coos Bay wagon road grant were patented to the railroad company subsequent to the definite location of the wagon road. (j) That 1,509.23 acres within the three-mile limits of the Oregon Central military wagon road grant were patented to the railroad company subsequent to the definite location of the wagon road. (k) That 1,365.03 acres were patented to the railroad company, but were embraced in prima facie valid entries made by parties at the time the definite location of the railroad line was fixed. (l) That 12,485.91 acres within the conflicting area of the railroad grant and the Corvallis and Yaquina Bay and the Willamette Valley and Cascade Mountain wagon roads were selected in aid of the wagon roads, or were entered by individuals subsequent to the filing of the railroad map of definite location, and that 245.98 acres of said area are va-

cant and unoccupied.   (m) That the remaining 1,959,122.83 acres were excepted from the grants on account of mineral character, and attachment of adverse rights prior to grants; this as to the primary limits. Of these several items the government concedes compensation for (b), (c), and (g), and there is no controversy as to (d).   The railroad company concedes that it is entitled to no compensation for (j), (k), and (m). The remaining items are in dispute.

Items 12 (e) and 12 (l), as appears from the agreed statement of facts, may now be considered together.   The controlling question involved arises from conflicting grants, namely, the grant of July 25, 1866, to the Oregon & California Railroad Company, or rather its predecessor, with the grant of July 4, 1866 (14 Stat. 86), to the state of Oregon, in aid of the construction of a military wagon road from Corvallis to Yaquina Bay, known as the Corvallis and Yaquina Bay wagon road, and with the grant of July 5, 1866 (14 Stat. 89), to the state of Oregon to aid in the construction of a like road from Albany, Or., to the eastern boundary of the state, known as the Willamette Valley and Cascade Mountain wagon road.   The line of the Yaquina Bay wagon road was definitely located March 3, 1868, and on April 13, 1868, the lands comprised by the grant were withdrawn from sale or other disposal by the Secretary of the Interior. The line of the Cascade Mountain wagon road was definitely located May 20, 1868, and the lands within the grant were withdrawn June 18, 1868.   On the other hand, the line of the railroad company was not definitely located until March 26, 1870.

The two wagon road grants were of alternate sections of public lands designated by odd numbers, three sections per mile, to be selected within six miles of the roads. The railroad grant is of alternate sections, designated by odd numbers, and it is provided that, when any alternate sections or parts thereof "shall be found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of, other lands, designated as aforesaid, shall be selected by said companies in lieu thereof."   This latter is a grant of lands in place, and it is now well settled that the grant was in præsenti, and that it became effective upon the filing of the map of permanent location of the line of the road, with relation back to the date of the grant.

[6, 7] As it pertains to the indemnity, the grant was in the nature of a float, and has been so regarded judicially.   The rights and privileges reserved thereby are not affected by the grant until and unless there has been selection actually made in the manner provided.   Leavenworth, L. & G. R. R. Co. v. United States, 92 U. S. 733, 741, 23 L. Ed. 634;  Van Wyck v. Knevals, 106 U. S. 360, 366, 1 S. Ct. 336, 27 L. Ed. 201;  Ryan v. Railroad Co., 99 U. S. 382, 386, 25 L. Ed. 305;  Oregon, etc., R. R. v. United States, 189 U. S. 103, 112, 23 S. Ct. 615, 47 L. Ed. 726.   As between conflicting grants, the prior rights of the grantees or their successors in interest are referable to and dependent upon the dates of the respective grants.   Missouri, K. & T. Ry. Co. v. Kan. Pac. Ry. Co., 97 U. S. 491, 500, 24 L. Ed. 1095.

[8] It is urged that the wagon road grants are quantity and not place grants.   This we may concede.   But it does not follow that they did not become effective as grants until selection of specific odd-numbered sections within the six-mile limits by the road companies.   In a sense, these grants are quantity grants.   They are in effect grants in place, with quantity selection.   The entire delimitations of six miles along the lines of road were set apart to the wagon roads for the purpose of satisfying their grants; they to make choice, within the limits designated, of the odd-numbered sections to satisfy the grants.   There was no race of diligence put on foot between the railroad company and these wagon road grantees as respects selection of lands within these delimitations.   The wagon roads simply had the right of selection until their grants were satisfied, unmolested by the railroad company.   In fact, it will appear that the railroad company was without right of selection to any extent whatsoever.

[9] It is a rule of law, no longer subject to controversy, that rights acquired in public lands prior to the date when a grant containing exceptive clauses, similar to the railroad grant in question, becomes effective, which are subsequently abandoned, do not operate to pass the lands or the right or title thereto on to the grantee, but such lands revert to the public domain.   Bardon v. Northern Pacific Railroad, 145 U. S. 535, 12 S. Ct. 856, 36 L. Ed. 806.   The principle is affirmed in United States v. Southern Pacific Railroad, 146 U. S. 570, 603, 13 S. Ct. 152, 36 L. Ed. 1091, and applied to conflicting grants.   There had been a legislative forfeiture of the prior grant, and it was contended that, by reason of the forfeiture, the lands involved inured to the use and ben-

efit of the later grantee. The court, however, was of the contrary view, and held without hesitancy that the lands reverted to the public domain. True, the Congress, by act of forfeiture, declared that the lands should be restored to the public domain. But it did no more than the law itself would exact on the failure of the railroad to observe the conditions of its grant. The defalcation would entail a reversion, not to another and conflicting grant of subsequent date, but to the United States, the primary source of title to all public lands.

It seems obvious, therefore, that whether there were selections or not within the delimitations of the wagon road grants, the grants themselves were segregations of the lands comprised thereby from the public domain, and that such lands were henceforth not subject to disposition to subsequent grantees at the time the later Oregon & California grant was made, and that no part of such lands inured to the benefit of the railroad company, but that they reverted to the public domain when the wagon roads had satisfied their demands by appropriate selection. This position has been acted upon and so treated by the railroad company, in view of the fact that it has, out of the 12,485.91 acres—item 12 (l)—for which it claims to be entitled to credit, used 8,157.88 acres as base for selection of indemnity. The fact that 245.98 acres included in this item are vacant does not help the railroad, because, as we have seen, they have reverted to the public domain. The railroad company is not entitled to credit for either item 12 (e) or 12 (l). Nor is it entitled to credit for item 12 (f), comprising 40 acres, for it also is governed by the foregoing conclusions.

We may now turn our attention to items 12 (h), covering 19,735.37 acres, and 12 (i), 8,874.89 acres. The acreage of both these items lies within the conflicting primary limits of the grants to the Oregon & California Railroad Company and the Coos Bay wagon road, the former of which underlies the latter, being first in order of date of the grant. The latter grant is of date March 3, 1869 (15 Stat. 340), and is to the state. Its place limits are odd-numbered sections within three miles on each side of the road, with indemnity limits comprising three miles extension of place limits. The state donated the grant to the wagon road company. The lands comprised by (h) have been patented to the wagon road company; those comprised by (i) to the railroad company. All the lands in (h) and 7,002.72 acres of the lands in (i) lie opposite that part of the railroad line which was definitely located subsequent to the definite location of the wagon road. The balance of (i), to wit, 1,872.17 acres, represents lands which lie opposite that part of the railroad line which was definitely located prior to the definite location of the wagon road.

As previously indicated in this opinion, as between conflicting grants, priority of place delimitations is fixed by the date of the grant, and not by definite location. See, further, St. Paul & S. C. R. Co. v. Winona Railroad, 112 U. S. 720, 5 S. Ct. 334, 28 L. Ed. 872; Southern Pacific Railroad Co. v. Bell, 183 U. S. 675, 22 S. Ct. 232, 46 L. Ed. 383. Confusion has arisen respecting these lands by reason of an early holding of the Commissioner of the Land Department that it was the date of definite location of the road which controlled as respecting the conflicting grants under consideration, and not the date of the grants. This holding was rendered by letter of January 8, 1874, but has subsequently been declared to be error by the Land Department itself. See letter of Commissioner to the Secretary of the Interior of June 29, 1900 (Exhibit 1, agreed statement of facts). This later holding has become the settled doctrine of the Supreme Court, and is no longer to be questioned. The error was one based upon a question of law, and not of fact, and title predicated upon such error was subject to repudiation at whatsoever period it might be directly attacked; this upon the assumption, of course, that no intervening incident had occurred to confirm or rectify the erroneous title.

But it is now asserted that, under the circumstances prevailing, the former holding of the Land Department was entirely correct, and should govern in the present controversy. It is quite true that no vested rights attach to the lands in place, unless there has been a definite location of the line of road as a means of fixing identity; but it does not follow that, pending the vesting of rights to particular lands under a grant which, by reason of nonobservance of conditions subsequent, is subject to forfeiture, Congress has the power, prior to forfeiture, to make other disposition of the lands. A brief review of the history of the grant which subsequently inured to the benefit of the Oregon & California Railroad Company will clarify the situation.

On July 25, 1866 (14 Stat. 239), Congress granted to such company organized under the laws of Oregon as the Legislature of the state should designate the lands com-

prised by the grant, and required the company seeking to avail itself of the act to file its assent to the terms thereof with the Department of the Interior within one year from its date, and to complete the first section of 20 miles within two years, and at least 20 miles of the road each year thereafter, and the whole road on or before July 1, 1875. By section 8 it was provided that, "in case the said companies shall fail to comply with the terms and conditions required, namely, by not filing their assent thereto as provided in section six of this act, or by not completing the same as provided in said section, this act shall be null and void, and all the lands not conveyed by patent to said company or companies, as the case may be, at the date of any such failure, shall revert to the United States." The Congress, by Act of June 25, 1868 (15 Stat. 80), extended the time for completing the first and subsequent sections of 20 miles, and for the whole road to July 1, 1880.

On October 6, 1866, the Oregon Central Railroad Company was incorporated. It is known as the West Side Company. On October 10, 1866, this company was designated by the Legislative Assembly of the state of Oregon as the one entitled to take the grant. Its assent to the granting act was filed in the office of the Secretary of the Interior July 6, 1867. On April 22, 1867, another company was incorporated as the Oregon Central Railroad Company, of Salem. This is known as the East Side Company. Thereupon the Legislature, on October 20, 1868, adopted a joint resolution declaring that the West Side Company was not lawfully incorporated, and designated the East Side Company as the one entitled to receive the grant. Having in view the controversy between the two companies, Congress, on April 10, 1869 (16 Stat. 47), passed an act amendatory to the granting Act of July 25, 1866, allowing any railroad company "heretofore" designated by the Legislature of the state to file its assent to such act in the Department of the Interior within one year from the date of the amendatory act. On June 8, 1869, the East Side Company, by resolution, duly accepted the terms and conditions of the grant, a certified copy of which acceptance was filed with the Secretary of the Interior June 30, 1869. The Oregon & California Railroad Company is the successor to the East Side Company.

[10] As it appears that the company which finally obtained the grant was not designated by the Legislature to receive it until October 20, 1868, more than a year from the date of the primary grant, and in view of the penalty of forfeiture and of the fact that the Coos Bay wagon road grant was made March 3, 1869 (15 Stat. 340), it is insisted that Congress unquestionably had power to make other disposition of the lands. It should be premised that, at the time the grant was made to the wagon road company, there had been no declaration of forfeiture by the government, either legislative or judicial, of any of the lands of the primary grant to the railroad company; nor has there ever been any such declaration of forfeiture as pertains to the lands now in controversy, except as they may be affected by the Chamberlain-Ferris Act. Forfeiture is not self-executing in any of these grants upon the mere nonobservance of a condition subsequent, and unless some step is taken by the government to enforce forfeiture, none can be otherwise insisted upon. Third parties, other than the government, cannot insist upon a breach of the conditions of the grant, and acquire rights in pursuance thereof. Schulenberg v. Harriman, 21 Wall. 44, 63, 22 L. Ed. 551; Lake Superior, etc., Co. v. Cunningham, 155 U. S. 354, 371, 15 S. Ct. 103, 39 L. Ed. 183. So that the question comes back to whether, under the conditions prevailing, the wagon road grant is the superior grant.

[11] The railroad grant was one in præsenti, and, as we have seen, when the line of road had been definitely located and fixed, the grant took effect by relation back to its date. This rule is inapplicable to conflicting grants, which take effect as of the date of the grant. So with the railroad company grant; it became effective, as between it and the wagon road grant, on the date it was made, which was the earlier, unless something in the act itself excepts it from the rule. We find no such provision or provisions. In support of its contention, the government relies particularly upon the cases of United States v. Oregon, etc., Railroad Co., 176 U. S. 28, 20 S. Ct. 261, 44 L. Ed. 358, and Atlantic & Pacific Railroad Co. v. Mingus, 165 U. S. 413, 17 S. Ct. 348, 41 L. Ed. 770.

On reference to these cases, it will be found, as to the first, that the grant to the Northern Pacific Railroad contains this clause: "And whenever, on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, * * * at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office, * * * oth-

er lands shall be selected by said company in lieu thereof," etc. The lands of the Northern Pacific grant were forfeited to the United States by legislative act of September 29, 1890 (26 Stat. 496). Meanwhile the Oregon & California Railroad Company had obtained patent to the lands in dispute, under its grant, which was later than the Northern Pacific grant. The purpose of the suit was to cancel these patents, on the ground that the lands covered thereby were excluded from the Oregon & California grant, because included in the Northern Pacific grant. Practically the turning point in the case hinged upon whether, as between the two grants, the Northern Pacific became effective at the date of such grant or later. The court held, among other things, that, as the grant did not include any lands that had been reserved, sold, granted, or otherwise appropriated at the time the Northern Pacific Railroad line was "definitely fixed," and as the route of such railroad had not been definitely fixed at the time the Act of July 25, 1866, was passed, or when the line of the Oregon Company was definitely located, etc., that the lands in controversy were not subject to forfeiture, or, in other words, that they inured to the benefit of the Oregon and California Railroad Company, although its grant was later in point of time when made. Thus it appears that the Northern Pacific grant was an exception to the general rule that, as between conflicting grants, the dates of the respective grants are determinative as to which is the superior in acquirement of title, or right. This was because the reservations enumerated in the Northern Pacific grant were made referable in point of time, not to the date of the grant, as is the usual case, but to the time when the line of the road was definitely fixed and plat thereof filed in the office of the Commissioner of the General Land Office.

The case of Atlantic & Pacific Railroad Co. v. Mingus, in so far as there is analogy to the case at bar, it would seem, turned upon practically the same conditions. The court says (page 440 [17 S. Ct. 356]): "There was no restriction upon the right of the government to dispose of public lands in any way it saw fit prior to the filing of the map of definite location."

The case of St. Paul Railroad v. Winona Railroad, supra, is without bearing upon the question under discussion. Its usefulness here consists in an absolute confirmation of the general rule which is found precisely stated in the first headnote.

It should be further noticed that the wagon road grant contains a proviso to the effect that any and all lands theretofore reserved to the United States, or otherwise appropriated by an act of Congress, are excepted from the operation of the grant, which in itself is quite sufficient in confirmation of the priority and superiority of the railroad company's title.

The government claims that, by reason of the fact that the railroad company has used, out of the acreage in item 12 (h), 16,974.45 acres as base for the selection of indemnity, the company should not be allowed credit for this amount comprised by such item. The patenting of these lands to the wagon road company was through mistake of law, and could not operate as an estoppel against the railroad subsequently to claim title thereto. So we think a complete answer to this contention consists in the fact, as is later ascertained and determined in this opinion, that at the date of permanent location of the railroad company's line of road there existed a clear deficiency in the indemnity limits to cover the losses to the company in the primary limits. Using the 16,974.45 acres as base, which the railroad company ought not to have been compelled to do, operated still further to deplete the already insufficient acreage in indemnity lands to restore the loss sustained to the primary limits. Thus was reduced the quantity of lands for which the company is now entitled to "full value" from the government as its compensation. In other words, the government took from it this acreage, to which the company was entitled, and gave back instead the same amount of the company's lands; that is, lands for which it should be now compensated. The injury was done when the railroad company was required to use as base lands to which it was entitled to patent, in depletion of an already insufficient area for indemnifying lost area within its place limits. The error was and is imputable to the government, and, having conduced to the injury of the company, it is but fair and equitable that it should bear the loss. I conclude, therefore, that the company is entitled to credit for the whole of the area comprised by item 12 (h), as also for the whole of the area comprised by item 12 (i).

Let us now advance to a consideration of certain controverted areas lying within the indemnity limits of the railroad grant. Before proceeding with the consideration thereof, it is well to notice the status of

the several tracts of land as set forth in item 13 of the agreed statement of facts, which is in brief as follows:

(a) The area of all odd-numbered sections within the indemnity limits of the two grants made by the acts of 1866 and 1870 is 1,858,533.80 acres, the status of which is as follows (as of date August 31, 1920):

(b) 966,925.01 acres have been properly patented to the railroad company.

(c) 11,430.30 acres are under consideration in the Department of the Interior, pending determination by the Secretary as to whether the railroad company is entitled to patent for same.

(d) 5,705.07 acres within the primary limits of the Coos Bay wagon road grant were patented to the railroad company subsequent to the definite location of the wagon road.

(e) 15,640.04 acres within the primary limits of the Coos Bay wagon road grant have been patented under that grant.

(f) 10,650.95 acres within the indemnity limits of the Coos Bay wagon road grant have been patented under that grant.

The lands mentioned in subdivisions (e) and (f) of this item were selected by and patented to the wagon road company subsequent to definite location, but prior to the construction of that portion of the railroad line which lies opposite said lands and prior to offer of any selection thereof by the railroad company.

(g) 57,875.62 acres within the conflicting limits of the grants for the Corvallis and Yaquina Bay and Willamette Valley and Cascade Mountain wagon roads were patented on selections made by individuals subsequent to definite location of the railroad line, but prior to offer of any selection by the railroad company, and 720 acres in said area are vacant on the records of the General Land Office.

(h) 68,522.27 acres were patented under the general land laws of the United States to parties other than the railroad company subsequent to definite location of the railroad line but prior to the offer of any selection of said lands on behalf of the railroad company. Of this area 25,801.14 acres were disposed of subsequent to June 29, 1900, and the remainder prior thereto.

(i) 32,158.75 acres were selected prior to survey, by the Northern Pacific Railway Company, under the Acts of Congress approved July 1, 1898 (30 Stat. 620), March 2, 1899 (30 Stat. 994), March 2, 1901 (31 Stat. 950), and May 17, 1906 (34 Stat. 197).

(j) 645.95 acres were withdrawn by the Secretary of the Interior for the Klamath Lake irrigation project.

(k) 472,000 acres, the mineral or nonmineral character of which had not been determined, were included within the limits of national forests by proclamation of the President of the United States. Of this area 190,000 acres were withdrawn for forest purposes prior to June 29, 1900, and the remainder were withdrawn subsequent to that date.

(l) The remaining 216,259.84 acres have been lawfully disposed of to others than the railroad company.

Items 13 (b), (c), and 720 acres of (g) are not controverted. The railroad company concedes it is not entitled to credit for items 13 (d), (e), 57,155.62 acres of (g), 42,721.13 acres of (h), and (l).

The first of these controverted areas is comprised by item 13 (f), consisting of 10,-650.95 acres. The stipulation of facts shows that this acreage, lying within the indemnity limits of the Coos Bay wagon road grant, was patented to the wagon road. In this we have a case where the lands lie within the indemnity limits of both grants, the railroad company grant being the prior or underlying grant. The lands were selected and patented to the wagon road company subsequent to the definite location of the railroad's line, but prior to the construction of its road, and prior to any offer of selection by the railroad company.

While it is conceded that, as it respects indemnity lands as between conflicting grants, "the first to select is the first in right," it is earnestly contended that the railroad company, because of a deficiency existing in its place limits, was not required to make selection, and therefore was entitled to its indemnity lands lying within the indemnity limits of the wagon road, by right of its earlier grant. It is further urged that, there having been a withdrawal by the Secretary of the Interior in aid of the railroad's grant, the wagon road company could make no valid selection in the meanwhile. We are now dealing with the July 25, 1866 (the East Side), grant.

[12] It is undoubtedly well settled that, as between conflicting grants, where the deficiency within the granted primary limits of one of them is so great that the indemnity lands will not make good the loss, no formal selection is necessary, as identification is satisfied when it is ascertained that all the indemnity is required to make up the deficiency in the primary grant. In such case, if the grant be the older one, no formal

selection is necessary for acquiring title as against a later grant. This exception to the general rule that the first to make selection becomes the first in right is without application, however, where the rights of settlers are involved. St. Paul & Pacific R. Co. v. Northern Pacific, 139 U. S. 1, 11 S. Ct. 389, 35 L. Ed. 77; United States v. Colton Marble & Lime Co., 146 U. S. 615, 13 S. Ct. 163, 36 L. Ed. 1104; United States v. Northern Pac. Ry. Co., 256 U. S. 51, 65, 41 S. Ct. 439, 65 L. Ed. 825.

[13] It was essential, I take it, as between these conflicting grants, as well as where settlers are concerned, that, before it could be determined that there was a deficiency in the indemnity limits to restore lands lost to the grant in the place limits, there should be an adjustment by the Secretary of the Interior of the grant of lands to the railroad company in respect of its place limits. Oregon & California R. R. v. United States, 189 U. S. 103, 23 S. Ct. 615, 47 L. Ed. 726, supra.

[14] Under the direction of the Secretary of the Interior, there was a preliminary adjustment made, in pursuance of the Act of March 3, 1887 (24 Stat. 556), by the Commissioner of the General Land Office, which was reported to the Secretary of the Interior by letter of date June 29, 1900 (Exhibit I, agreed statement of facts), by which it appears that such a deficiency existed in the amount of 385,767.83 acres. This adjustment was not approved by the Secretary of the Interior until 1916, long after the litigation was instituted on the part of the United States to forfeit the grant. But whether the adjustment was legally sufficient or not, it appears by the agreed statement of facts, we repeat, that these lands comprised by item 13 (f) were selected and patented to the wagon road company subsequent to the definite location of the railroad's line, but prior to the construction of its road opposite the lands in question.

Definite location in this locality was had about March 26, 1870, and January 7, 1871, and the road was constructed, completed, and in operation, part of it in the summer of 1872, part in 1882, and the remainder in May, 1883; so that beyond peradventure the selection was made by the wagon road company long prior to the time of the preliminary adjustment. There was at that time no means of advisement whereby the wagon road company would be made aware of the deficiency (which was essential before it could be deprived of its right of selection), although one did in fact exist, as we shall

hereafter see. The burden rested with the railroad company to establish the fact that the deficiency existed at the time the selections were made by the wagon road company, and, further, that the condition was brought to the knowledge and attention of the wagon road company, so as to thwart or intercept its proceeding in the exercise of its usual right or privilege in making selections. Otherwise the railroad company could not insist that it was relieved of the responsibility of making selection by reason of a deficiency within the indemnity limits. This burden the railroad company has not met.

Such is the doctrine of United States v. Northern Pacific Ry. Co., supra. The question there arose with relation to a temporary withdrawal by the government, and whether the deficiency existed at the time such withdrawal was made. As one of the items of testimony tending to show deficiency was a published decision of the Land Department, Hessey v. Northern Pacific Ry. Co., 43 Land Dec. 302, whereby it was declared that the grant under consideration was so far deficient that many losses within the place limits must remain unsatisfied, and therefore that compliance with a provision that indemnity selections be made from lands nearest the line of the road was no longer required. But the court held that, as the finding related to a situation existing December 9, 1909, it could not be taken as showing that there was a deficiency almost six years before, when the withdrawal in question was made. The court further remarks that the situation may have changed materially in the meantime.

Here a much greater length of time elapsed prior to the time of any adjustment of the grant. The railroad company was not then in a position to avail itself of the deficiency for excusing it from the burden of making selection on its part. Nor is it now entitled to claim that no selection was required of it for acquirement of title.

Now, as to the effects of the Interior Department's withdrawal of lands within the railroad company's indemnity limits from sale or other disposition, the withdrawal was from sale of both place and indemnity lands, and was made soon after the appropriate maps of definite location of the road were prepared and filed with the Secretary of the Interior. This withdrawal was revoked August 15, 1887. The Supreme Court, in the case of Oregon & California R. R. v. United States, 189 U. S. 103, 23 S. Ct. 615, 47 L. Ed. 726, supra, following the doctrine announced in the case of Hewitt v. Schultz,

180 U. S. 139, 21 S. Ct. 309, 45 L. Ed. 463, declared that the Secretary of the Interior was without power to promulgate the withdrawal, as it affected the indemnity limits within this grant of 1866. The reasons therefor are fully stated in the cases just cited.

It is presented that these were cases in which settlers were involved, and that they are without application where conflicting grants are concerned. The distinction sought to be made, however, can scarcely avail the railroad company in the present instance. We have seen that the railroad company, by reason of lack of prior adjustment, has not sustained its position that there existed a deficiency in the indemnity limits of its grant which could be said to have relieved it from the necessity of making selection. So that, in order for identification, it was still essential to make selection after its line of road had been fixed and established, and this before it could acquire the superior right to indemnity lands. It results that, as it relates to conflicting grants, applying the rule that the first in selection is the first in right, the Wagon Road Company would have the better right. Indeed, it was declared in the O. & C. R. R. Co. Case that, "as to lands of the latter class [within indemnity limits], the company acquires no interest in any specific sections until a selection is made with the approval of the Land Department; and then its right relates to the date of the selection." We conclude, therefore, that the attempted withdrawal does not avail the railroad company.

[15] It is further presented that, because of the provision contained in the wagon road grant, namely, "And provided further, that any and all lands heretofore reserved to the United States, or otherwise appropriated by act of Congress or other competent authority, be, and the same are hereby, reserved from the operation of this act," the railroad company has the better title to these lands. This was but a precautionary measure on the part of Congress to avoid, as far as possible, controversy touching matters that might arise by reason of the fact of conflict between this and the railroad grant. Congress knew, of course, that these two grants were conflicting, so it said: "Any and all lands heretofore reserved * * * are hereby reserved from the operation of this act." Congress must also have had in view the rule pertaining to selections within indemnity limits, where there are conflicting grants. But there is no evidence to be drawn from this clause, obvious or apparent,

8 F.(2d)—42

that the grantees were to observe any different course from the usual one in acquiring title through the method of selection, and both were put to their diligence in observance of the rule that the first in time of selection is the first in right. The railroad company is not entitled to credit in the accounting for item 13 (f), comprising 10,-650.95 acres.

The next inquiry pertains to item 13 (h), comprising 68,522.27 acres. Of this it is conceded that the railroad company is not entitled to 42,721.13 acres, by reason of the same having been disposed of prior to the preliminary adjustment of 1900. The remaining 25,801.14 acres were patented by the government to other parties, presumably to homesteaders and purchasers under the Timber and Stone Act, subsequent to such preliminary adjustment. It does not appear when the homesteaders or other claimants made settlement upon or laid claim to these lands subsequently patented by the government, whether before or after the preliminary adjustment. If before, their rights would appear to have been superior to that of the railroad company. But the most serious objection to the contention reposes in the fact that the settlers were given no notice of the preliminary adjustment. No such notice had been, so far as the record shows, communicated to the local land offices for their advisement, and presumably the settlers were not so advised, so that nothing stood in the way of their entering upon the lands and seeking to appropriate them through means provided by the acts of Congress. It would seem that the question involved is precluded by Oregon & California R. R. Co. v. United States, supra, and that the railroad company is not entitled to compensation for these acres.

[16] Item 13 (i), comprising 32,158.75 acres, is controverted by the railroad company. These lands were lieu selections, made by the Northern Pacific Railroad Company, the company having obtained the base therefor under and in pursuance of the Act of Congress approved July 1, 1898 (30 Stat. 620), and acts amendatory thereto of March 2, 1901 (31 Stat. 950), and May 17, 1906 (34 Stat. 197); and also under Act of March 2, 1899 (30 Stat. 994). These statutes conferred on the Northern Pacific Railroad Company the right, through relinquishment of certain lands comprised by its place or indemnity limits, to which claim had attached through purchase from the government, or through settlement under color of claim or right, to select, in lieu of the lands

relinquished, other public lands, surveyed or unsurveyed, not reserved and free from adverse claim at the time of selection, situated within any state or territory into which the grant extended.

By Act of March 2, 1899, the Mt. Rainier National Park was created and its limitations designated. The act provided that, upon relinquishment to the government by the Northern Pacific of the lands comprised by its grant lying within the national park, the company should be entitled to select other lands, in lieu of such relinquishment, elsewhere within any state into which its grant extended. A like right or privilege was conferred upon settlers within the reserve, upon relinquishment of their holdings, to select other lands in lieu thereof, to the same extent and under the same limitations and conditions as are provided by law for forest reserves and national parks.

All this acreage was selected by the Northern Pacific Railroad Company between the dates of 1898 and 1911, inclusive, within the indemnity limits of the 1866 grant to the predecessor of the railroad company, and subsequent to the time when it had made definite location of its road. Further specifying, 13,400.18 acres of these lands were selected prior to June 29, 1900, when the preliminary adjustment was reported to the Secretary of the Interior, and 18,758.57 acres subsequent to that date.

The grants of the Northern Pacific Company and the Oregon & California Company were, in their origin, conflicting grants, the former being prior in date to the latter. The prior grant, however, did not become effective as such, until the line of road had become definitely fixed and the plat thereof filed in the office of the Commissioner of the General Land Office. Act July 2, 1864 (13 Stat. 365), so construed and held by the Supreme Court in United States v. O. & C. R. R. Co., 176 U. S. 28, 20 S. Ct. 261, 44 L. Ed. 358, supra. In so far as these lands are concerned, the Northern Pacific grant never did become effective. But in any event the Oregon & California Railroad grant must be considered prior in time when the effective date of the Northern Pacific grant is taken into account. So that, in principle, we have the case here of conflicting grants. The question is presented whether it was within the power of Congress to confer a right upon the Northern Pacific to make lieu selections within the indemnity limits of the Oregon & California grant in place of lands lost to the former grant or taken into a forest reserve.

The lands involved in this discussion, it must be understood, were never selected by the Oregon & California Railroad Company, largely because of the fact that they were unsurveyed. But selection was not necessary on its part, if by reason of lands lost to place limits there existed a deficiency in indemnity limits to make good the loss. The court in United States v. Northern Pac. Ry. Co., 256 U. S. 51, 41 S. Ct. 439, 65 L. Ed. 825, supra, very distinctly and very explicitly declares it is not admissible for the government to reserve or appropriate to its own use lands in the indemnity limits required to supply losses in place limits. A reference to the language of the court will indicate with what emphasis it enunciated the principle. After referring to section 6 of the act pertaining to the grant, by which, as had been previously construed, all lands in the indemnity limits were to be and remain subject to the operation of the preemption and homestead laws save as the odd-numbered sections should be taken out of their operation by indemnity selections, the court says:

"But that provision gives no warrant for thinking that, after the company has earned the right to receive the lands comprehended in the grant, the government is free to reserve or appropriate to its own uses lands in the indemnity limits which are required to supply losses in the place limits. We say 'required,' because we perceive no reason to doubt that lands in the indemnity limits may be so reserved or appropriated where what remains is sufficient to satisfy all the losses.

"While it often has been said that under such a grant no right attaches to any specific land within the indemnity limits until it is selected, an examination of the cases will show that this general rule never has been applied as between the government and the grantee where the lands available for indemnity were not sufficient for the purpose. Its only application has been where either the rights of settlers were involved, or the lands available for indemnity exceeded the losses, thereby making it essential that there be a selection and identification of the particular lands sought to be taken."

We need only turn to a table and statement in evidence by the government, which accompanied a letter of the Secretary of the Interior to the Attorney General of date September 19, 1917, referred to in item 11 (a) of agreed statement of facts, to be definitely and specifically advised as to the state of indemnity lands in acreage in compari-

son with the acreage lost to the grant at and subsequent to the time of definite location of the Oregon & California line. We find that there were lost to the place or primary limits, prior to the definite location of the line of road, 1,692,092.04 acres. There were within the indemnity limits but 1,791,232.03 acres. Of these there were "otherwise disposed of," which evidently means prior to definite location (see chart, Exhibit 2, in evidence by railroad company as part of the testimony of B. A. McAllaster), 844,594.81 acres, leaving within indemnity limits 946,637.22 acres. Deducting this acreage from the loss to the primary limits prior to definite location, namely, 1,692,092.04 acres, we get the true deficiency as of that date, namely, 745,454.82 acres, which is to say that the indemnity lands were that much short of meeting the loss in the primary limits. It would seem that there could be no mistake as to this. However, there have been submitted in evidence certain charts through Mr. B. A. McAllaster as a witness, who has been Land Commissioner for the railroad company since September, 1908, the accuracy of which charts is not seriously questioned by counsel for the government, and from which are deduced the following conclusions:

The figures respecting acreage and other details vary somewhat from the chart introduced by the government, but not materially, except as to those representing "lost by prior adverse entries"—that is, prior to definite location—in indemnity limits, which are stated at 195,607.56 acres. (It will be noted that the corresponding acreage in the government's chart is stated under the subhead "Otherwise Disposed of" as 844,594.81.) Lost to the grant (East Side), primary limits, 1,679,385.05 acres. Total area in the indemnity limits, 1,793,524.89 acres. Covered by adverse entries prior to date of definite location, 195,607.56 acres. Deducting this last from the total acreage in indemnity limits, we have 1,597,917.33 acres, representing the acreage left in the indemnity limits to make good the loss to the primary limits. Deducting the amount from the figures representing such loss, we have 81,467.72 as indicating the deficiency in acreage, to meet the loss incurred in the primary limits. This includes in the reckoning, item 13 (b) to (k), inclusive, 121,221.86 acres conceded by both parties to have been lost to the indemnity limits, to which there must be added 36,452.09 acres, which the court now finds are also lost to such indemnity limits.

The charts or tables go further, and include the West Side grant. As to this, they show primary limits, 398,074.19; lost to the grant by adverse entries prior to date of location, including mineral lands, 279,737.78 acres; comprised within the restricted indemnity limits, 65,008.91 acres; lost through adverse entries prior to location, 20,652.28 acres—leaving but 44,356.63 acres to make good the loss in primary limits, thus leaving a deficiency in this grant of 235,381.15 acres. So that, taking the estimate most favorable to the government, it is without question established that, at the date of definite location of the railroad company's lines of road, there was a clear and indisputable deficiency within the indemnity limits of either or both grants, singly or combined, with which to make good the losses in the primary limits. The date of definite location of the lines of roads, East and West Side, in their full extent, was not later than 1884.

Obviously the government was not dependent upon an adjustment by the Secretary of the Interior of the grants, for ascertainment of the deficiency, before it was obliged to take cognizance thereof. The grants, being laws as well as contracts, are as binding upon it as upon the railroad company. It was bound to know that a deficiency existed whenever it accrued, and to protect the railroad company against any further depletions within the indemnity limits, which might be brought about through its own acts.

The acts of Congress under which the lieu selections were authorized came much later than 1884—the earliest in 1898 and 1899. So it is manifest that, at the date the selections were authorized, the Congress was without authority or right to dispose further of any lands within the indemnity limits. The indemnity lands having been reduced to a deficiency whereby to make good the losses sustained to the primary limits, they were necessarily appropriated to satisfy such losses, and no selection was henceforth necessary on the part of the railroad company. While it is true these lieu selections were to be made by the Northern Pacific Railroad Company, a private corporation, yet the government could not authorize another to do that which it could not do itself.

For the reasons here given, I hold that the railroad company is entitled to compensation for the lands comprised by item 13 (i).

Item 13 (k) involves the inquiry touching whether the railroad company should have credit for the 472,000 acres comprised thereby. These lands lie within the indemnity limits of the grant, and were included within the limits of national forest reserves by the proclamation of the President. The character of the lands, whether mineral or nonmineral, has not been determined; 190,000 acres of these lands were withdrawn for forest reserve purposes prior to June 29, 1900, and the balance of 282,000 acres subsequent thereto. The Act of March 3, 1891 (26 Stat. 1095, 1103 [Comp. St. § 5121]), authorized the President, by proclamation, to set apart public reservations "in any part of the public lands." By the Act of June 4, 1897 (30 Stat. 11, 34 [Comp. St. § 5123]), the President may revoke, modify, or suspend any such executive order or proclamation, or any part thereof, from time to time.

In pursuance of such authority, the President, on June 17, 1892, set apart the Bull Run Reserve, and on September 28, 1893, the Cascade Range Forest Reserve, and subsequent to June 27, 1900, issued divers proclamations creating and adding to numerous public parks and reserves, whereby sundry lands within the indemnity limits of the railroad company's grant were set apart within such reserves. These lands within such indemnity limits were unsurveyed, and the company had never had a chance or opportunity of making selections. All these reserves and additions were set apart by the President long subsequent to the time, as shown by the evidence, that a deficiency was found to exist within the indemnity limits to meet the losses sustained to the place limits, and it was therefore inadmissible for the government to reserve or appropriate to its own use any of such lands. The lands, by reason of the deficiency, as we have seen in our examination of item 13 (i), had previously and necessarily become appropriated to meet the losses sustained to the place grant. They were not at that time a part of the public domain, and were unsusceptible of appropriation by the government. It results that the railroad company is entitled to credit for the whole of the acreage comprised by item 13 (k).

Item 13 (j) comprises 645.95 acres withdrawn by the Secretary of the Interior for the Klamath Lake irrigation project. This acreage is governed by like consideration as above, and the railroad company is entitled to credit therefor also.

As respects item 12 (d) and items 13 (e)

and (k), the lands comprised thereby are subject to determination by the Land Department respecting their mineral character. Bearing in mind these exceptions noted, the court finds that the railroad company is entitled to credit for lands within place limits, as follows:

| | |
|---|---|
| Properly patented .........1,913,672.50 | acres |
| Erroneously patented to individuals ................. 1,943.19 | acres |
| Under consideration in department ................ 285,562.95 | acres |
| Patented to Coos Bay wagon road ................. 14,221.03 | acres |
| Patented to Coos Bay wagon road ............... 19,735.37 | acres |
| Patented to Oregon & California Railroad ............. 8,874.89 | acres |
| | |
| Total place limits ......2,244,009.93 | acres |
| Within indemnity limits: | |
| Properly patented.......... 966,925.01 | acres |
| Subject to consideration by department .............. 11,430.30 | acres |
| Vacant on record of General Land Office ............. 720.00 | acres |
| Northern Pacific lieu selections .................. 32,158.75 | acres |
| Taken by government in forest reserves ............. 472,000.00 | acres |
| Taken in Klamath Lake irrigation project ...... .... 645.95 | acres |

Total indemnity limits ..1,483,880.01 acres
Grand total of both primary and indemnity limits, 3,727,889.94 acres.

This, at $2.50 per acre, gives the full value to which the railroad company is entitled, namely, $9,319,724.85. If the railroad company is successful in reversing the Hammond and Winton and Booth Kelly Lumber Company judgments, this sum will remain the same. If not, the government will make good the loss, which is the value at $2.50 per acre of 65,256.14 acres, or $163,140.35. So that in the end the amount of recovery against the government will still be the same, less the amount of counter credit to which it is entitled, namely, $5,242,246.50, or a balance of $4,077,478.35.

Decree will be entered, making proper provision, on account of exceptions noted, respecting investigation touching mineral character of lands yet subject to selection, and lands set aside by proclamation and taken for reserve and irrigation purposes, and the appeal matters in Hammond and Winton and Booth Kelly Lumber Company judgments.

The defendant, the Central Union Trust Company of New York, is the successor to the Union Trust Company of New York, and as such is the holder of a mortgage upon the greater portion of the lands involved

in this accounting. The mortgage bears date of July 1, 1887. It covers all the granted lands, except such as the railroad company had sold prior to May 12, 1887; the quantity sold aggregating 188,306.57 acres. It provides that the "proceeds of lands so sold shall be applied * * * to the redemption and cancellation of bonds"; that is, "the net proceeds of lands sold subsequently to May 12, 1887, * * * are to be applied to the redemption and cancellation of such bonds." The parties to the mortgage have treated "net proceeds" as meaning gross proceeds less the expenses of administering the grant.

By a stipulation of facts, it appears that the railroad company paid expenses to November 30, 1911, $909,994.12, and taxes to June 30, 1908, $1,111,854.87. These payments were approved and accepted by the trustee of the Central Union Trust Company. The balance received by the Oregon & California Company, after deducting these sums, namely, $2,497,713.01, was paid over to the trust company. It further appears that the railroad company has since paid expenses to and inclusive of August 31, 1920, $438,553.21, and taxes, $1,605,995.34. The trustee has neither approved nor disapproved these payments. About these latter figures there appears to be a mistake, as they do not tally with the total expenses and taxes paid to February 28, 1923. Hence attention is called to "Receipts and Disbursements as per Auditor's Report February 28, 1923," as admitted in evidence through the testimony of B. A. McAllaster, Land Commissioner of Oregon & California Railroad Company, which shows total expenses after date of mortgage, $1,268,749.40, and taxes, $2,691,528.49. Deducting $909,994.12 from the former and $1,111,854.87 from the latter, the balance indicates expenses and taxes unapproved, respectively, $358,755.28 and $1,579,673.62. We are now dealing with the railroad company and the trust company, and not as between the railroad company and the government as heretofore, so that the two accountings must be kept separate. It is only necessary to observe that, in the accounting between the railroad company and the government, nothing has been allowed the company for expenses of administration, or for taxes down to and inclusive of 1912. Taxes for the following three years, save at a valuation of $2.50 per acre, are to be paid by the government. But as previously remarked, we are dealing only with the statement as between the railroad company and the trust company, which renders the problem for solution a simple one.

It is necessary as between the railroad company and the trustee to keep separate the accounts of the mortgaged and unmortgaged lands. The "full value" of the acreage covered by the mortgage (3,539,583.37 acres at $2.50 an acre) is $8,848,958.43. Of the total receipts by the railroad on account of the granted lands the sum of $685,724.78 was received for and on account of the unmortgaged lands (Additional Stipulation of Facts, item 2), and the balance, $4,556,521.72, was received on account of the mortgaged lands. Deducting from the amount which should be credited by the government on account of the mortgaged lands the sum which should be credited to the government on account of the receipts from the mortgaged lands leaves the sum of $4,292,436.71 as the balance due from the government on account of the mortgaged lands. Deducting from this balance the amount which should be credited to the railroad company by the trustee for taxes and expenses heretofore unapproved in the accounting with the trust company, a total of $1,938,428.90, leaves the sum of $2,354,007.81 as the amount due to the trustee. The difference between this last-named amount and the full value of all the lands ($4,077,478.35) leaves $1,723,470.54 as the total amount due to the railroad.